**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,**

v.

**CHICAGO MINIATURE LAMP WORKS, Defendant.**

**No. 79 C 2362.**

United States District Court,
N.D. Illinois, E.D.

Aug. 13, 1986.

John C. Hendrickson, Margaret Lee Herbert, Daniel Preciado, E.E.O.C., Chicago, Ill., for plaintiff.

Jerold S. Solovy, William D. Snapp, Julia A. Martin, Michael T. Brody, Sophia R. Papandreas, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

On October 30, 1985 this Court decided the liability phase of this case after an extended trial. Its extensive Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") (in the "Opinion," 622 F.Supp. 1281) held Chicago Miniature Lamp Works ("Chicago Miniature") liable for (*id.* at 1313):

> (a) having discriminated against blacks as a class, on account of their race, in both recruitment and hiring for entry-level factory jobs, and having engaged in a pattern and practice of such disparate treatment of blacks and (b) having established and carried out policies and practices of recruitment as to such jobs that had a disparate adverse impact upon blacks and constituted a pattern and practice of discrimination, all in violation of Title VII.

After some six months[1] Equal Employment Opportunity Commission ("EEOC") submitted its motion and supporting memorandum on the remedies aspect of the case, asking this Court to determine:

1. the length of the class period;

2. the length of the backpay[2] period; and

3. the method of distributing a backpay award.

That motion has been fully briefed by the parties,[3] and this opinion will address each of the three issues in turn.

### Class Period

EEOC first asks for a decision on the time period of Chicago Miniature's liability.[4] Both sides agree on two aspects of that question:

1. During that time counsel for the parties sought unsuccessfully to agree on various aspects of the remedial phase. EEOC also sought to comply with, but ultimately viewed as impracticable, this Court's initial post-trial directive for submission of "an all-encompassing proposed order which would govern the remedial phase of this litigation and resolve, or provide for the resolution of, all the remaining issues ..." (EEOC Mem. 2). Because the current topics are therefore more limited, this opinion is no more than another way station on the road to final disposition.

2. Though 42 U.S.C. § 2000e–5(g) employs "back pay" as an adjective-noun combination, our Court of Appeals quite consistently merges the two words into one. This Court will therefore follow the latter practice despite Congress' different usage.

3. "Fully" indeed: Consistently with all prior submissions in the case, something over 110 pages of memoranda (exclusive of Chicago Miniature's extensive supplement) have been tendered for this Court's consideration.

4. Conclusion 6, 622 F.Supp. at 1306 explicitly said "no conclusion" had been reached on that score. Chicago Miniature Mem. 2 n. 2 now says the question (at least to the extent it controls

1. Only persons who were discriminated against by Chicago Miniature during that time period can become members of the class entitled to relief.

2. That class period ended June 29, 1981—the date of Chicago Miniature's last entry-level hire.

What they dispute—hotly—is the opening date of the class period.

Chicago Miniature first says, accurately enough, a charge of employment discrimination under Title VII must be filed within 300 days after the alleged unlawful employment practice (see 42 U.S.C. § 2000e–5(e)).[5] Chicago Miniature then contends only individuals who personally suffered specific instances of discrimination at its hands during the 300–day period before EEOC issued its November 9, 1978 Letter of Determination (the "EEOC Letter") can become class members. That would set the opening date of the class period at January 13, 1978.

EEOC retorts Chicago Miniature engaged in a continuous course of discrimination against blacks as a class. It points to this Court's Findings (622 F.Supp. at 1288–1302) that the evidence showed a discriminatory underrepresentation of blacks in Chicago Miniature's recruitment and hiring for entry-level factory jobs for each year from 1970–81 (see, e.g., Summary Findings 71 and 117, *id.* at 1296, 1302). EEOC asserts that consistent underrepresentation establishes a "continuing violation" in Chicago Miniature's actions towards blacks as a class. Hence EEOC submits every victim of Chicago Miniature's discrimination during that 1970–81 time period can become a class member.[6]

*Stewart v. CPC International, Inc.,* 679 F.2d 117, 120–21 (7th Cir.1982) (citations omitted) identified three "continuing violation" theories:

In the first situation, "continuing violation" is the term used to describe the rule that a violation of Title VII occurs, and triggers the time limit for filing a charge, when the employee knew or should have known that he or she was discriminated against. This rule is applied in cases, usually involving hiring or promotion practices, where the employer's decision-making process takes place over a period of time, making it difficult to pinpoint the exact day the "violation" occurred. . . .

The second situation is typified by *Bartmess v. Drewrys USA, Inc.,* 444 F.2d 1186 (7th Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971), in which the employer's express, openly espoused policy was alleged to be discriminatory. In *Bartmess,* women were forced to retire at 62, while men were forced to retire at 65. The plaintiff filed a discrimination charge shortly before her mandatory retirement. Defendant contended that because she had not yet been forced to retire, her complaint was not timely. This court held that the policy amounted to a continuing violation of Title VII, so that her filing was not premature. . . .

In the third situation, the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy as in *Bartmess, supra.* In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts.

---

non-backpay relief) is moot, and that may prove to be the case on further examination, but the subject surely needs to be addressed. In back-pay terms, it will define the potential sharers in the fund Chicago Miniature must create (see later text discussion).

**5.** All further references to Title VII will simply take the form "Section—," referring to Title 42's numbers rather than Title VII's internal numbering.

**6.** EEOC refers to Chicago Miniature's March 28, 1970 EEO–1 filing, showing the actual number of black entry-level workers at Chicago Miniature was 10.9 standard deviation units below the expected number (see Finding 70, 622 F.Supp. at 1296). EEOC would place the beginning of the class period at that March 28, 1970 date.

Courts applying the "continuing violation" notion to the longstanding-discriminatory-practice situation may effectively treat the EEOC filing as relating back to the onset of that period, bringing earlier acts of discrimination within the limitations period. Thus *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York*, 633 F.2d 232, 249, 250–51 (2d Cir. 1980) (citations and footnotes omitted) applied the continuing-violation concept to permit recovery by class members victimized by defendants' discriminatory hiring policies before the 300–day limitations period:

> Even if the unjustified refusals to hire did not comprise the core of defendants' discriminatory conduct,[7] at the very least they represented the culmination of a continuously maintained illegal employment policy.... And it is settled law that the limitation period determining the timeliness of a complaint filed as to such a policy is measured from the last occurrence of an instance of that policy.
>
> \*    \*    \*    \*    \*    \*
>
> Nothing in [*United Air Lines, Inc. v.*] *Evans* [, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)] supports the notion that a refusal to hire within the 300 day period preceding the filing of an EEOC charge may not properly be viewed as a current manifestation of a continuing violation.

Therefore, we hold that the district court properly rejected the view that the department's discriminatory refusals to hire were merely effects of earlier discriminatory conduct. Furthermore, we hold that the district court properly declined to limit relief to those plaintiffs who were wrongfully refused employment within the critical 300 day period.... These refusals were not discrete acts; they were carried out pursuant to a conceded and consistent policy. All plaintiffs injured by the department's post-Act adherence to that policy are therefore entitled to relief.

But cf. *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1442–43 (9th Cir.1984) (stating the "continuing violation doctrine announced in this circuit [cannot] operate[ ] to eliminate the limitations period," but then going on to announce (opaquely) relief would extend not only to class members "discriminated against during the [300–day] limitation period" but also to each class member who was simply "a member of a group exposed to discrimination during that time").[8]

Chicago Miniature disputes the application of the continuing-violation doctrine to this case on three grounds:

    1. It never implemented any "specific" and "consistent" discriminatory hiring policy.

    2. It did not instigate a recruiting system designed to shut out potential black applicants.

    3. Even if it engaged in a continuing violation, only persons who were themselves victims of a discriminatory act occurring within the 300–day limitations period can become members of the class.

None of those contentions has merit.

As to the first argument (EEOC's claimed failure to establish a "specific" and "consistent" discriminatory hiring policy), Chicago Miniature Mem. 14–15 says this Court simply inferred the existence of hiring discrimination from statistical evidence and did not identify a specific discriminatory policy that caused the statistical imbalance. Chicago Miniature urges EEOC therefore cannot rely on a continuing violation theory to extend the class period beyond the 300–day limitation period.

It is true that some of the continuing-violation cases on which EEOC relies did identify specific discriminatory selection proce-

---

7. [Footnote by this Court] Non-hiring of blacks *was* of course the "core of defendant's discriminatory conduct" here.

8. Quaere whether that last clause in *Domingo* produces the same result as *Guardians Association* where blacks were (as in this case) "a group exposed to discrimination during" the relevant 300–day period.

dures. But *Stewart,* 679 F.2d at 121 makes clear the existence of an "express, openly espoused policy" is only one means of bringing the continuing-violation doctrine into play. Continuing violations can also arise from covert practices (*id.*). This Court's analysis of EEOC's statistical evidence specifically found such covert policies at work in Chicago Miniature's hiring practices (622 F.Supp. at 1295, 1296, 1299, 1302, record references omitted):

68. In summary, the statistical probability of Chicago Miniature's hiring so few blacks into entry-level jobs in the 1978–81 period, in the absence of racial bias against blacks in recruitment and hiring, is virtually zero.... This Court finds Chicago Miniature's actual hiring pattern demonstrates such a racial bias in both recruitment and hiring.

\* \* \* \* \* \*

71. In summary (and as was true as to Chicago Miniature's hiring), the statistical probability of Chicago Miniature's having so few blacks in entry-level jobs in its work force during the 1970–81 period, in the absence of racial bias against blacks in recruitment and hiring, is also virtually zero.... This Court finds Chicago Miniature's actual work force composition demonstrates such a racial bias in both recruitment and hiring.

\* \* \* \* \* \*

103. ... In every instance the actual number of black applicants for entry-level factory jobs at Chicago Miniature is so many standard deviation units below the expected number, in the absence of racial bias against blacks in either recruitment or hiring or both, as to produce a statistical probability of virtually zero....

104. In summary, there can be no other conclusion from Chicago Miniature's applicant flow analysis but that its recruiting and hiring practices discriminated against blacks, and this Court so finds.

\* \* \* \* \* \*

117. In summary, this Court finds as a matter of fact that Chicago Miniature has since at least from the early 1970s through 1981 engaged in a pattern and practice of class discrimination against blacks, on account of their race, in both recruitment and hiring for entry-level factory jobs.

EEOC's evidence proved a discriminatory underrepresentation of blacks in Chicago Miniature's work force throughout the 1970–81 period. That led to the conclusion Chicago Miniature's pattern and practice of discrimination against blacks had continued throughout that period.

Indeed, EEOC would prevail even if the continuing-violation doctrine did require it to prove a specific procedure that caused the consistent underrepresentation of blacks. Contrary to Chicago Miniature's assertion (Mem. 14), this Court did specify a particular discriminatory policy practiced by Chicago Miniature (Conclusion 20 n. 11, 622 F.Supp. at 1310–11 n. 11):

EEOC has clearly ... identif[ied] Chicago Miniature's reliance on word-of-mouth as the cause of the disparity in recruiting and hiring.

In short, EEOC has proved Chicago Miniature continuously used discriminatory hiring policies to exclude blacks from its entry-level work force.

Next Chicago Miniature says it did not actively direct and encourage the word-of-mouth recruiting process. Chicago Miniature Mem. 18 contends EEOC has not shown a link between that recruiting process and any "employer discrimination." It then "reasons" EEOC cannot peg its continuing violation claim on this Court's finding of a pattern or practice of discrimination in recruitment.

But Chicago Miniature has already litigated and lost that argument. Findings 23 and 25 explicitly found (622 F.Supp. at 1288):

23. ... Chicago Miniature utilized and relied primarily upon word-of-mouth to recruit applicants for entry-level factory jobs.

\* \* \* \* \* \*

25. Chicago Miniature's heavy utilization of and reliance upon word-of-mouth recruiting resulted in the exclusion of blacks from the network of information concerning jobs at Chicago Miniature, gross underrepresentation of blacks in Chicago Miniature's applicant flow, and perpetuation of the gross underrepresentation of blacks in, and their exclusion from, Chicago Miniature's entry-level work force. . . .

Those Findings were integral to this Court's ultimate conclusion Chicago Miniature had intentionally discriminated against blacks (see summary Conclusion 23, 622 F.Supp. at 1311). And Chicago Miniature utilized that employment practice throughout the 1970–81 time period. Chicago Miniature's continuing decision to rely on word-of-mouth, rather than other recruiting methods, provides the necessary employer linkage to the continuing pattern or practice of recruiting discrimination.

Finally, Chicago Miniature Mem. 20–21 concedes the continuing-violation doctrine permits a victim of a discriminatory act within the 300–day limitations period to recover for earlier discriminatory acts. But Chicago Miniature insists that doctrine does not permit a person discriminated against outside the 300–day period to become a class member even if a "continuing violation" exists. *Domingo*, 727 F.2d at 1443 contains the language on which Chicago Miniature relies:

[A]s a prerequisite to obtaining relief, each class member must demonstrate, by fact of employment or otherwise, that he or she had been discriminated against during the limitation period or was a member of a group exposed to discrimination during that time.

As n. 8 reflects, that language is ambiguous in the current setting. Each of EEOC's proposed class members belongs to a group—black persons—"exposed to discrimination" during the 300–day limita-

tions period. But whatever the proper reading of *Domingo*'s less-than-crystal-clear phrasing may be, this Court elects to follow the square holding in *Guardians Association*, 633 F.2d at 251: Because Chicago Miniature engaged in a continuing course of discrimination against black persons, even persons who suffered discrimination during the earlier part of that continuous period (and not just within the 300 days) can become class members entitled to relief.

\* \* \*

In summary, none of Chicago Miniature's arguments against the application of the continuing-violation doctrine succeeds. Accordingly the class period extends from March 28, 1970 to June 29, 1981. All persons victimized by Chicago Miniature's pattern and practice of discrimination against blacks during that time period are class members entitled to relief (though the precise significance of that entitlement remains for the future).

### Backpay Period

■ Section 2000e–5(g) provides in part: Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. EEOC argues Chicago Miniature's backpay liability should begin two years before March 9, 1978 (when Randolph filed his charge with EEOC). Chicago Miniature counters:

1. Its backpay liability should begin no earlier than two years before November 9, 1978 (when EEOC issued its Letter).

2. Laches limits any claim for backpay to the 300–day period before EEOC issued the Letter.

Once again, neither contention succeeds.

Randolph filed his race discrimination charge with EEOC March 9, 1978.[9] Chicago Miniature says:

---

9. Chicago Miniature Mem. 4 n. 3 and 6 n. 4 now says it "believes" Randolph's charge did not become "effective" until after March 9, 1978. But

at trial it had *stipulated* to that date and this Court so found (Finding 5, 622 F.Supp. at 1286):
On March 9, 1978 Randolph filed a timely Charge of Discrimination.

1. That charge did not provide notice EEOC intended to assert claims of discrimination in recruitment and hiring.

2. It had no notice of those claims until EEOC issued its November 9, 1978 Letter.

3. Backpay liability should therefore be measured from that date.

But Section 2000e–5(b) makes clear the filing of an individual charge with EEOC empowers EEOC to launch an investigation of that charge. Though an individual charge does not give EEOC carte blanche to investigate a company's employment practices, such charges often (as was true here) uncover facts giving rise to broader proceedings. This Court has specifically held (526 F.Supp. 974, 974–75 (N.D.Ill. 1981)) the claims in EEOC's Letter developed in the course of a reasonable investigation of Randolph's charge.

Neither side has offered authority, nor has this Court located any, as to the event that constitutes effective "notice" for backpay purposes where the ultimate class claim is a reasonable outgrowth of an initial individual charge of discrimination. It is therefore unclear whether Chicago Miniature can be saddled with the March 9, 1978 date as a matter of *law*. But it is certainly clear November 9, 1978 is too late a measuring point as a matter of *fact*. Because the concept is one of "notice," it appears likely a date such as March 20, 1978 may be the relevant date.[10] Final resolution of the issue, however, must await further submissions (evidentiary, legal or both) by the parties.

■ Chicago Miniature also contends laches precludes any claim for backpay preceding the start of the 300–day period before a charge was filed with EEOC. Because its March 28, 1970 EEO–1 statement showed a statistical underrepresentation of blacks in its entry-level work force, Chicago Miniature says (1) EEOC should have pursued its claims at that time and (2) EEOC's "inexcusable delay" has "materially prejudiced" Chicago Miniature.

In real world terms that is a troublesome concept indeed. EEOC receives an enormous volume of such routine filings—so much so that it cannot conceivably be expected to police them for statistical disparities and to launch investigations when any such variations are disclosed. No such "Big Brother" staffing exists or would be desired by anyone—including Chicago Miniature's counsel, who might (quite properly) be expected to be among the first to complain of bureaucratic harassment if such practices were followed as to their clients. In all candor, that kind of laches argument by counsel is offensive if seriously advanced, and doubly so if not. Laches, after all, is based on inaction following *actual* knowledge, not following the kind of fictitious imputed knowledge urged by Chicago Miniature.

■ There is another and independent basis for rejecting the laches argument. Laches is an affirmative defense that operates to bar an action on the merits (see Rule 8(c)). And *Jeffries v. Chicago Transit Authority*, 770 F.2d 676 (7th Cir.1985), relied on by Chicago Miniature, involved just such an early (and hence timely) assertion of the laches doctrine to preclude prosecution of the merits of a plaintiff's Title VII claims. In this case Chicago Miniature *never* pleaded such an affirmative defense to EEOC's claims, and that failure resulted in a waiver of the defense. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1278 (1969 and 1986 supp.) and cases cited. Chicago Miniature cannot raise it now to defeat the class' remedy.[11]

This Court will not allow a litigant to play fast and loose with its commitments, as Chicago Miniature's counsel would have it do.

**10.** Chicago Miniature Mem. 16 in support of its 1981 motion for summary judgment refers to a March 20, 1978 EEOC letter and questionnaire sent to Chicago Miniature, to which the company did not respond by providing requested information going beyond the scope of Randolph's charge. If EEOC sought to expand its inquiry that early, Chicago Miniature may be held to have been "on notice" then.

**11.** This case was seven years old, and months past an extended trial as to liability, before Chicago Miniature saw fit to assert a laches

It is true *Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598, 603 (7th Cir. 1979), *cert. denied,* 454 U.S. 1060, 102 S.Ct. 612, 70 L.Ed.2d 599 (1981) (also relied on by Chicago Miniature) reduced a plaintiff's backpay award to reflect a lengthy delay between the filing of the discrimination charge with EEOC and the bringing of a lawsuit based on the charge; and see this Court's like decision in *Killingham v. Board of Governors of State Colleges and Universities,* 549 F.Supp. 225, 227 (N.D.Ill. 1982). By contrast, here there was virtually no delay between the filing of Randolph's charge, EEOC's investigation and the filing of this lawsuit. And as already indicated, the claimants' deliberate sleeping on their rights in the *Kamberos-Killingham* situation contrasts sharply with what Chicago Miniature contends for here.

■ Finally (though this may mean kicking a dead horse), laches should not be invoked against the government when it acts to enforce a public right or protect a public interest. *Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary, United States Department of Energy,* 683 F.2d 1171, 1178 n. 14 (8th Cir.1982). EEOC acted to protect the interests of blacks as a class promptly after it received a complaint from an individual asserting discrimination by Chicago Miniature. For that as well as the several reasons already discussed, this Court will not apply laches against EEOC at this late stage.

### Classwide Distribution

■ EEOC seeks to distribute the backpay award on a classwide basis using a "shortfall/pro rata" procedure. EEOC Mem. 15–18 describes that procedure at length. In brief, it calls first for a calculation of the number of black entry-level workers Chicago Miniature would have been expected to hire (on a statistical basis) absent discrimination. That expected number less the actual number of black hires constitutes the "shortfall": the number of entry-level positions presumptively denied

defense. Should it not be barred by its own

to black persons because of Chicago Miniature's discriminatory conduct.

Once the shortfall is so determined, the amount of wages those workers would presumably have earned is calculated. That backpay fund is then distributed pro rata among the claimants.

Chicago Miniature does not object to use of a classwide procedure to calculate its maximum backpay liability. It does quarrel with two aspects of EEOC's distribution proposal:

1. It wants this Court to hold individual hearings to determine each claimant's right to receive a backpay award.

2. It would reduce each claimant's pro rata share to reflect the probability that the claimant would not in fact have been hired.

Both Chicago Miniature's counterproposals are rejected.

In effect the first would require this Court to determine which class members Chicago Miniature would have hired. *Stewart v. General Motors Corp.,* 542 F.2d 445, 452–53 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977) explains why that approach should not be followed in this case:

The major difficulty in attempting to compute a backpay award in a case such as this one is that the subjectivity of defendant's method of filling job vacancies renders impossible anything like a precise calculation of the pecuniary effects of discrimination. In light of the uncertainty which clouds the task before us, we must set down three general rules: (1) unrealistic exactitude is not required; (2) ambiguities in what an employee or group of employees would have earned but for discrimination should be resolved against the discriminating employer; (3) the district court, far closer to the facts of the case than we can ever be, must be granted wide discretion in resolving ambiguities.... It is with these rules in mind that he [sic] will discuss some of the problems that will face the

laches from raising laches?

district court on remand. The first issue which must be clarified is whether backpay should be awarded on an individualized basis to particular employees or on a classwide basis to be divided among the entire group which plaintiffs represent. Where possible, an individualized remedy should be utilized because it will best compensate the victims of discrimination without unfairly penalizing the employer.... In determining the appropriate award to be made to black employees who were unfairly denied promotions to salaried positions, however, the utilization of an individualized method of calculation is impossible. Because General Motors had no objective standards by which to measure whether a given employee deserved a promotion, deciding in individual cases whether a particular person would have been promoted but for racial discrimination would lead the district court into a "quagmire of hypothetical judgments" ... in which any supposed accuracy in result would be purely imaginary.

Therefore, it is necessary to use a classwide procedure in awarding backpay as compensation for defendant's failure to promote black employees to salaried positions because of their race. While such a method may generate a windfall for some employees who would have never been promoted had vacancies been filled on a nonracial basis and undercompensate the genuine victims of discrimination by forcing them to share the award with their undeserving brethren, it is the best that can be done under the circumstances. In any event ... "[a]ny method is simply a process of conjectures." ... Given a choice between no compensation for black employees who have been illegally denied promotions and an approximate measure of damages, we choose the latter.

Here Finding 57 says (622 F.Supp. at 1293) (record references omitted):

57. Chicago Miniature did not maintain or utilize objective written hiring procedures.... It had no education requirements for hire into entry-level factory jobs ..., nor has it required any prior job experience as a minimum qualification for hire into such jobs.... Instead, basic manual dexterity and the ability to speak some English have been the only minimal qualifications required by Chicago Miniature for hire into such jobs....

In that light the "individualized remedy" is really not "appropriate" in the sense conveyed by *Stewart*. Because Chicago Miniature's entry-level jobs required only minimal qualifications, it cannot be said with certainty which individual claimants would have been hired absent the discrimination. But certainly some claimants would have been hired, and the assumption (with which Chicago Miniature does not quarrel for maximum liability purposes) is that the number hired would have mirrored the racial makeup of Chicago. Individual entitlement hearings would defeat the utility of a classwide award and drag this Court into a "quagmire" of guesswork. *Stewart*'s promotion-related uncertainties are matched by the uncertainty of determining who would or should have received the discriminatorily denied jobs here. It does not "unfairly penalize" Chicago Miniature to use a classwide backpay approach.

Chicago Miniature also contests EEOC's proposed pro rata distribution among the claimants. EEOC has proposed simply dividing the backpay fund pro rata among the claimants. Every case cited by both sides has followed that route (see, e.g., *Hameed v. International Association of Bridge Workers*, 637 F.2d 506, 519–22 (8th Cir.1980)).[12] Yet Chicago Miniature would instead require a calculation of the number of additional blacks who would have applied but for its discriminatory recruiting

**12.** Chicago Miniature cites two cases to support its different position. But in each of those cases, the number of actual claimants fell short of the number used to calculate the total class award. Of course, if the total number of claimants in this case does prove less than the calculated shortfall in black hires, no claimant would receive more than the backpay amount attributable to one job.

and then divide that number into the total backpay figure. Chicago Miniature would have that figure represent the maximum individual backpay award, regardless of the actual number of claimants.

It is easier to pose an illustrative example than to set out in words the differing impacts of the two methods. Suppose for instance:

1. Chicago Miniature's total backpay liability were determined to be $350,000 (a rounded-off figure from its own hypothetical example).

2. But for its recruiting discrimination, Chicago Miniature would have attracted 2,000 additional black applicants.

3. Nonetheless, only 1,000 black persons actually present claims.

EEOC's procedure would automatically exhaust the backpay fund, so each claimant would receive $350:

$$\frac{\text{Total Backpay Fund}}{\text{Number of Claimants}} = \frac{\$350,000}{1,000} = \$350 \text{ per claimant}$$

But under Chicago Miniature's procedure each claimant would receive only $175, so their claims would use up only half the total backpay fund:

$$\frac{\text{Total Backpay Fund}}{\text{Number of Applicants}} = \frac{\$350,000}{2,000} = \$175 \text{ maximum per claimant}$$

Common sense dictates the number of black applicants Chicago Miniature should have attracted will greatly exceed the number of black hires that forms the basis of computing its total backpay liability. Thus it seeks to play a numbers game: So long as the number of actual claimants proves less than the number of applicants discriminated against, their claims (as calculated by Chicago Miniature) will not exhaust the backpay fund—even though Chicago Miniature would actually have paid out those funds to blacks in wages, but for its discriminatory hiring.

Chicago Miniature again urges—accurately but irrelevantly—EEOC cannot identify exactly which individual claimants would have been hired. It argues each claimant's backpay award should reflect the possibility he or she would not in fact have been hired. But once again that tries to take advantage of an uncertainty caused by Chicago Miniature's own wrongdoing.

In proper focus, the real question is the number of additional black workers Chicago Miniature should have hired. Basing its total backpay liability on that number does not create a burden in excess of the amount of "make whole" relief properly attributable to those lost jobs. Chicago Miniature's proposal simply introduces another level of guesswork into an already uncertain procedure. This Court adopts EEOC's version of the shortfall/pro rata distribution procedure.

### Conclusion

For purposes of determining claimants entitled to relief, the class period runs from March 28, 1970 to June 29, 1981. Chicago Miniature's backpay liability begins two years before a 1978 date to be established by further submissions. Its total backpay amount shall be distributed on a classwide basis using the shortfall/pro rata approach.