**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**CHICAGO MINIATURE LAMP WORKS, Defendant.**

**No. 79 C 2362.**

United States District Court, N.D. Illinois, E.D.

Aug. 19, 1987.

John C. Hendrickson, E.E.O.C., Chicago, Ill., for plaintiff.

Jerold S. Solovy, William D. Snapp and Michael T. Brody, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court has issued two opinions—one very extensive, the other shorter though complex [1]—in this race discrimination case. After an extended bench trial, the Findings of Fact and Conclusions of Law (reported in "Opinion I," 622 F.Supp. 1281) held Chicago Miniature Lamp Works ("Chicago Miniature") liable for (*id.* at 1313):

(a) having discriminated against blacks as a class, on account of their race, in both recruitment and hiring for entry-level factory jobs, and having engaged in a pattern and practice of such disparate treatment of blacks and (b) having estab-

---

1. That complexity was inevitable, given the    complex issues posed by this case.

lished and carried out policies and practices of recruitment as to such jobs that had a disparate adverse impact upon blacks and constituted a pattern and practice of discrimination, all in violation of Title VII.

Then "Opinion II," 640 F.Supp. 1291 determined:

1. the length of the class period;
2. the length of the backpay period; and
3. the method of distributing a backpay award.

This third opinion treats with another issue relevant to the remedies aspect of the case and not really analyzed in any detail by the few decided cases in this area: how to implement the statutory mandate included in 42 U.S.C. § 2000e–5(g) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable" [2]) in the context of the "shortfall/pro rata" procedure for classwide distribution decided upon in Opinion II, 640 F.Supp. at 1298–1300.[3] For the reasons stated in this opinion, this Court accepts some (but not all) of Chicago Miniature's contention as to the methodology to be followed, while rejecting that offered by EEOC.

At the outset it must be remembered—and it must be kept in mind throughout the analysis—that the shortfall/pro rata procedure is no more than a surrogate for the recovery that the class members would receive if it were possible readily to identify the specific victims of Chicago Miniature's race discrimination. If that were so:

1. Each such victim would be entitled to receive the wages he or she would have received if hired by Chicago Miniature, minus (in order to implement Section 2000e5(g)) his or her actual earnings or those he or she could reasonably have made during the relevant period.

2. On the other side of the coin, Chicago Miniature's liability would be the total of the net amounts thus recoverable by the victims.

■ It is equally essential to keep in mind throughout the analysis the underlying purpose of Title VII, which the seminal case of *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) defined as "to make persons whole for injuries suffered on account of unlawful employment discrimination"—a purpose "shown by the very fact that Congress took care to arm the courts with full equitable powers" (*id.*). This means that once employer discrimination has been proved the focus must be on relief to the *individual* (see, e.g., *Connecticut v. Teal,* 457 U.S. 440, 453–54, 102 S.Ct. 2525, 2533–34, 73 L.Ed.2d 130 (1982); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978); *Los Angeles Department of Water and Power v. Manhart,* 435 U.S. 702, 708–09, 98 S.Ct. 1370, 1375–76, 55 L.Ed.2d 657 (1978)). Devices such as the shortfall/pro rata method, though they perforce draw upon group concepts as a matter of logistics, must still be employed in a manner so as to make whole the individual discriminatees—not to benefit the discriminator by relieving it of proper responsibility.

■ In this instance, Chicago Miniature's discriminatory conduct has itself made it impossible to identify the specific victims of that discrimination. Opinion II, 640 F.Supp. at 1298–99 made that point en route to deciding that classwide distribution was called for here. As Opinion II demonstrated, our Court of Appeals' opinion in *Stewart v. General Motors Corp.,* 542 F.2d 445, 452–53 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977) taught the same lesson. And *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1444 (9th Cir.1984)

2. For shorthand purposes that provision will be referred to in this opinion either as "Section 2000e–5(g)" or as the "statutory mitigation requirement."

3. This opinion makes no effort to be self-contained. It assumes the reader's familiarity with Opinions I and II, particularly the description and discussion of the shortfall/pro rata procedure in Opinion II.

(modified in respects not relevant here, 742 F.2d 520 (9th Cir.1984))[4] speaks eloquently to the same point in dealing with an employer that had made individualized determinations difficult (or impossible) by the same word-of-mouth recruitment method Chicago Miniature used:

> The facts of this case justify a departure from an individualized remedy for each claimant although we recognize that as a general rule that approach should be used. *See Hameed v. International Association of Bridge Workers,* 637 F.2d 506, 519 (8th Cir.1980); *Stewart v. General Motors Corp.,* 542 F.2d 445, 452 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Nefco's lack of objective hiring criteria and use of word-of-mouth recruitment directed at particular ethnic groups makes it difficult to determine precisely which of the claimants would have been given a better job absent discrimination, but it is clear that many should have. In such a situation, class-wide relief is appropriate. "[W]hen the class size or the ambiguity of promotion or hiring practices or the illegal practices continued over an extended period of time calls for [a] quagmire of hypothetical judgment ... a class-wide approach to the measure of back-pay is necessitated." *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 261 (5th Cir.1974).

Because classwide relief in the shortfall/pro rata form is necessarily an artificial construct,[5] the system has to work imperfectly in terms of the two results described earlier (that is, the amount properly recoverable by each victim and the amount properly payable by the discriminatory employer). As the term "pro rata" reflects (Opinion II, 640 F.Supp. at 1299–1300), the total pool representing the employer's liability (itself an estimated amount) is carved up into smaller slices so that no class member can get the full recovery obtainable if he or she were the specifically identifiable victim of nonhiring on a date certain. What a court must accomplish under such circumstances is succinctly described in *Hameed,* 637 F.2d at 521 n. 19 (emphasis added):

> The method of distributing the back pay due the 45 "actual" discriminatees [the number of persons determined in *Hameed* as the result of the "shortfall" calculation] among the more than 45 claimants should not result in some persons obtaining a back pay award greater than their actual damages. Back pay is intended to compensate for injury, not to reward plaintiffs or penalize defendants. If there are more than 45 claimants, not all claimants will receive back pay equal to the amount they would receive if they were actual discriminatees. The district court's task on remand is to devise an equitable distribution of the amounts due. *The maximum any one claimant may recover is the amount due if he were an actual discriminatee. The maximum liability of the Union* [the party corresponding to Chicago Miniature here] *is the aggregate amount of back pay that would be due 45 actual discriminatees.*

What the parties fight about here is how to effectuate the statutory mitigation requirement once the calculations are made under the shortfall/pro rata method. Chicago Miniature argues each class member—who will (almost unquestionably) already be starting out with a potential recovery much less than the amount an identified victim would get[6]—should have that already-reduced figure further reduced to reflect what class members generally (or

---

**4.** Chicago Miniature seeks to rely heavily on *Domingo* in its arguments on the current motion, while EEOC Mem. 10 speaks of *Domingo* as "perhaps the case closest to this one."

**5.** Indeed, *every* situation in which the specific victims of discrimination are not identifiable has to generate a remedy built on the best hypotheses the trial court can draw from the facts before it.

**6.** That is the inevitable result of having more claimants than the number of expected hirings, as determined on a statistical basis, in the absence of discrimination. It would be surprising if that excess of claimants over hirings did not prove to be the case.

the individual class member, if that figure is greater) did earn or could have earned elsewhere. EEOC counters by urging that would give Chicago Miniature a real windfall by reducing its liability sharply from the figure called for by its Title VII violation (the amount specified in the last sentence of the quoted *Hameed* footnote), while such a reduction is not at all demanded by the statutory mitigation requirement.

There is certainly nothing in the statutory language to *compel* the result urged by either side, nor is there any real enlightenment in the reported cases on this score. Some cases have spoken briefly along the lines contended for by Chicago Miniature, but in each instance they have done so without any real analysis of the problem. EEOC relies on a simple proposition: As between the alternatives of (1) providing relief for the discriminated-against class members (subject of course to the limitations stated in the quoted *Hameed* footnote) or (2) providing relief to Chicago Miniature from the effects of its discriminatory conduct, the operative principle should be that stated in *Domingo,* 727 F.2d at 1445 (citing both *Stewart* and *Pettway* ):

> All uncertainties should be resolved against the employer.

And that statement of principle is typical of what courts have consistently and sensibly said in resolving such uncertainties in the remedial phase of employment discrimination cases:

> *Stewart,* 542 F.2d at 452 ("In light of the uncertainty which clouds the task before us, we must set down three general rules: (1) unrealistic exactitude is not required; (2) ambiguities in what an employee or group of employees would have earned but for discrimination should be

resolved against the discriminating employer; (3) the district court, far closer to the facts of the case than we can ever be, must be granted wide discretion in resolving ambiguities").

*Pettway,* 494 F.2d at 260–61 ("Therefore, in computing a back pay award two principles are lucid: (1) unrealistic exactitude is not required, (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer").

Accord, *Segar v. Smith,* 738 F.2d 1249, 1290–91 (D.C.Cir.1984).[7]

But that unquestioned principle states only the premise—it does not give the answer. To search for a solution that conforms to Title VII's purposes and the statutory mitigation requirement, the methodology to be followed in this case must in any event first involve the making of three determinations in accordance with Opinions I and II:

1. the total amount of the backpay fund under the shortfall calculation;

2. the backpay amount attributable to one job without reference to mitigation (that is, the total backpay fund divided by the number of expected hirings of class members in the absence of discrimination)[8]; and

3. the total number of claimants.

For illustrative purposes the numbers said by EEOC Mem. 3–4 to be approximations based on Chicago Miniature's own experience are these:

(a) 700 "shortfall jobs"; and

(b) a $6 million backpay fund calculated under the shortfall method.

---

7. It is worth observing that *Domingo* and the other just-cited cases do not at all exhibit an anti-employer bias (or any other impermissible judicial attitude). Instead such cases are simply a manifestation of the general legal proposition that a wrongdoer should not be permitted to take advantage of uncertainties created by its own wrongdoing. See, e.g., *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946):

> The most elementary conceptions of justice and public policy require that the wrongdoer

shall bear the risk of the uncertainty which his own wrong has created.

8. This opinion's discussion is of course oversimplified, because it treats all claimants as though they had the same application date and all other variables were ignored. Any necessary refinements, to the extent they do not create the impossible conditions of individualization addressed in Opinion II, can be dealt with later in the actual implementation of the remedy. This opinion is rather intended to state the underlying principles to be followed.

That would produce a backpay amount per shortfall job of about $8,570. In what appears to be a pure guesstimate (but one this opinion will follow for illustrative purposes), EEOC postulates 2,000 claimants seeking to share in the total fund.[9] Division of the $6 million backpay fund by the 2,000 claimants would produce a recovery of $3,000 per claimant.

What EEOC would do is to lop the mitigation amount—the amount earned by claimants in other employments—off of the value of the shortfall job (in this case $8,570). If that reduced figure were still more than $3,000 (in other words, if the average claimant's earnings elsewhere were less than $5,570), Chicago Miniature would still be liable for the full backpay fund (in the assumed example, $6 million).

But that does not fairly give effect to the statutory mandate. To see how that mandate would best be met, we may assume the same set of facts (700 shortfall jobs and a $6 million backpay fund) in a situation where the victims of Chicago Miniature's discrimination _were_ specifically identifiable. Assume further that the earnings of each of those identifiable victims in other employment were $4,000 (thus defining the mitigation amount). On that assumption, each of the 700 discriminatees would receive $4,570 (that is, the per-job value of $8,570 less the earnings elsewhere of $4,000), and Chicago Miniature's total liability for its discriminatory conduct would be $3.2 million rather than $6 mil-

lion.[10] That would represent a direct application of Section 2000e–5(g).

In this case, of course, the victims of discrimination are not specifically identifiable. But if it were assumed that all the class members (those who, specifically because of the impossibility of identification, will share in the award) were to have the same average earnings of $4,000 in other employment, a fair reading of the statutory mitigation requirement would be to produce the same aggregate liability for Chicago Miniature as in the identifiable-victim situation. That is the precise message of the last sentence of the _Hameed_ footnote (adapted to this case and to the assumed example):

> The maximum liability of [Chicago Miniature] is the aggregate amount of backpay that would be due [700] actual discriminatees.

What this Court finds to be the proper procedure (drawing in part upon Chicago Miniature's proposed method [11]) does just that. It involves ratably reducing the total earnings by each claimant [12] to reflect the ratio of shortfall jobs to the total number of claimants (in EEOC's hypothetical example, which is being used for analysis, 700/2000 or 35%). Thus the payment to someone who had earned (say) $4,000 in other employment would be reduced by 35% of that amount ($1,400), thus rendering Chicago Miniature liable to that person for $1,600 (that is, $3,000 less $1,400). And

9. EEOC's hypothesized numbers—700 shortfall jobs and 2,000 claimants—illustrate the point discussed earlier (see n. 6 and the corresponding text).

10. As n. 8 suggests, the real-world application of the statute would be different: Each discriminatee's individual earnings would cause him or her to be entitled to a different net award. But an _average_ earnings figure of $4,000 would still lead to a $3.2 million liability for Chicago Miniature, and that suffices to permit the illustrative comparison made by the text that follows.

11. This opinion employs only a part of Chicago Miniature's proposal because that proposal seeks a potential _double_ limit on the award calculations—one on the backpay fund (using a ratable-reduction method similar to that described in this paragraph of the text) and one on

the individual awards as well. But Chicago Miniature's double-dip approach could conceivably subject it to a lesser liability than it would have owed to comparable identified victims. For the policy reasons previously discussed in the text, Chicago Miniature is not entitled to be thus rewarded for its own wrongdoing. By contrast, this Court's method puts Chicago Miniature in no better and no worse position by reason of the fact that the discriminatees are not specifically identifiable.

12. Although neither EEOC nor Chicago Miniature says so in so many words, both of them obviously assume part of each claimant's claim will be a statement of his or her actual earnings during the relevant period. That being so, this Court is at a loss to understand why all claimants must be treated alike (rather than individually) in terms of the award.

if that person were (as previously assumed) the typical claimant, the total liability of Chicago Miniature would be $3.2 million ($1,600 times 2,000)—*exactly* the same as if the victims of Chicago Miniature's discriminatory conduct were identifiable.

Moreover, the just-described method meets the other criterion that claimants should be dealt with fairly (that is, proportionately) in relation to what their respective mitigation amounts proved to be.[13] Thus this Court's methodology is fair in individual as well as in average terms, so as to be fully responsive to this opinion's previously-stated emphasis on relief to the individual.

This entire discussion has spoken of *actual* earnings, while Section 2000e–5(g) also refers to "amounts earnable with reasonable diligence." To the extent Chicago Miniature would seek to rely on what claimants *should have* earned rather than their *actual* earnings, it would remain to be seen whether that might better be done on a classwide (or appropriate sub-classwide) basis rather than individually.[14] But whichever method is followed, the principles would be identical to those just stated in the prior two paragraphs for actual earnings.

In this Court's view, the method described in this opinion reflects a total faithfulness to both the spirit and the letter of Title VII. For that reason, some rather than all of Chicago Miniature's proposal has been accepted, while EEOC's has been rejected entirely.

This action is set for a status hearing August 28, 1987 at 9 a.m. At that point the parties should be prepared to address the most expeditious means of getting this litigation on the track toward final disposition.

---

13. Two extremes might be supposed:
   1. If a claimant could not fairly be charged with any other earnings at all, 35% of $0 would of course result in a $0 reduction from the $3,000 payment to that claimant.
   2. If a claimant earned fully $8,570 from other employment in the relevant period, 35% of that figure would produce a $3,000 number—and that amount subtracted from the prospective $3,000 payment would give *nothing* to that claimant. That would of course be exactly the same as the statute would provide for an identified victim whose earnings from outside employment were equal to what he or she would have gotten from the discriminatory employer.

14. That group approach (rather than an individual one) appears to be the thrust of the proposals made by both Chicago Miniature and EEOC, though they approach the problem from widely different points of view.