**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner,**

v.

**CW TRANSPORT, INC., Respondent.**

**No. 86–C–680–C.**

United States District Court, W.D. Wisconsin.

April 10, 1987.

James N. Finney, E.E.O.C., Washington, D.C., for petitioner.

James Moeller, Gage & Tucker, Kansas City, Mo., and Charles S. Mishkind, Miller, Canfield, Paddock & Stone, Grand Rapids, Mich., for respondent.

## ORDER

CRABB, Chief Judge.

This is a civil action for enforcement of a consent decree entered into by respondent CW Transport in 1974. Under section XI of the consent decree, "all orders relating to compliance" are to be sought in the judicial district where the defendant employer, here CW Transport (CWT), maintains its principal place of business. Jurisdiction is present under 28 U.S.C. § 1331.

Petitioner Equal Employment Opportunity Commission (EEOC) filed with this court a petition for supplemental relief for CWT's alleged continuing violations of the 1974 consent decree and alleged unlawful employment practices under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* In its petition, the EEOC sought a civil contempt order, damages of $8,625,000 in back pay, and prospective relief designed to enforce certain aspects of the consent decree.

■ Now before the court is CWT's motion "to dismiss and/or for summary judgment."[1] CWT has moved for summary judgment on the grounds of laches, statute of limitations, the EEOC's failure to comply with the notice provisions of the consent decree, and certain other procedural irregularities by the EEOC. Alternatively, CWT argues that parts of the decree are overly vague and unenforceable and that the remainder of the decree is enforceable only by prospective relief and not by money damages. Finally, CWT contends that the decree is unenforceable under recent case law because it imposes nonvictim-specific, race-conscious preferences that are not based upon a prior finding of race discrimination.

Based on the petition, the proposed findings of fact, and the affidavits and other documents submitted by the parties, I find that there is no genuine dispute as to the following material facts.[2]

---

1. Since CWT has presented matters outside the pleading in connection with its alternative motion, that motion will be treated as one for summary judgment pursuant to Rule 56 and not as one for failure to state a claim upon which relief can be granted. *See* Rule 12(b), Federal Rules of Civil Procedure.

2. Despite the caution of Rule 56(e) that the non-moving party may not rest upon its pleading, this court's local procedures requiring the non-moving party to respond specifically to the movant's proposed findings, and two extensions of time, the EEOC did not submit a response to CWT's proposed findings of fact or any affida-

## FACTS

Petitioner EEOC is one of the administrative agencies charged with monitoring the consent decree that is the subject of this lawsuit. Respondent CWT is a Wisconsin-based trucking company that is incorporated in Delaware and that employs approximately 1900 employees at approximately 75 locations throughout the country.

### 1. Background

This lawsuit was filed by the EEOC on September 15, 1986, to enforce a consent decree entered into by CW Transport and other trucking companies on March 20, 1974. On that date, the United States Attorney General commenced an action in the United States District Court for the District of Columbia against over 350 of the nation's largest trucking companies, the International Brotherhood of Teamsters, the International Association of Machinists and Aerospace Workers, and the trucking industry's national bargaining representative, Trucking Employers, Inc. (now Trucking Management, Inc.). Each of the trucking companies sued was a party to the National Master Freight Agreement, each employed at least 100 persons, and each had annual gross revenues of at least one million dollars. Together the defendant companies embraced virtually the entire trucking industry. The trucking companies were sued as a defendant class.

The complaint in that case alleged that the companies' seniority system violated Title VII and Executive Order 11246; that the unions perpetuated the effect of the companies' discriminatory practices by entering into the National Master Freight Agreement; and that "the defendants had engaged in systematic discrimination against black and Spanish-surnamed employees and applicants, the most important relating to the separation of employees into two classes, 'over-the-road drivers' and 'city drivers.'"

A consent decree was negotiated between the United States Department of Justice and seven named company defendants, who denied that they were class representatives. The decree was filed on March 20, 1974 in the United States District Court for the District of Columbia. On May 22, 1974, the EEOC was substituted as a party plaintiff for the United States with regard to the Title VII aspects of the case.

### 2. The Consent Decree

The consent decree included eleven sections: a general resolution against employment discrimination; hiring goals and attainment levels; job standards and testing; recruitment; training; transfer; a monetary compensation procedure providing for backpay; records and reports; adjustment of deficiences; compliance officials; and the retention of jurisdiction by the court. In one of the series of cases centering on the trucking companies, known collectively as the "TMI cases," [3] the court struck the

vits in opposition to the motion. The EEOC states in the introduction to its brief in opposition that the brief contains the EEOC's opposition to CWT's proposed findings. This clearly is inadequate under both Rule 56 and this court's local procedures. In its brief, the EEOC does not respond specifically to CWT's proposed findings, and it does not cite to the record aside from general references to provisions of the consent decree. Accordingly, I have assumed that there is no genuine issue as to any material fact proposed by CWT and supported by the record.

I have assumed also that the parties stipulate to the authenticity of the documents attached to the EEOC's Memorandum in Support of It's [sic] Petition for Supplemental Relief (exhibits A–R) and to CWT's Motion to Dismiss and/or for Summary Judgment (exhibits C–I). Although neither party submitted certified or otherwise authenticated copies of these documents, both parties refer freely in their briefs to each other's exhibits. Accordingly, I will assume the authenticity of these exhibits for the purpose of deciding this motion.

**3.** The reported decisions in the Trucking Management, Inc. litigation include: *United States v. Trucking Employers, Inc.*, 561 F.2d 313 (D.C.Cir.1977), *later appeal, United States v. Trucking Management, Inc.*, 662 F.2d 36 (D.C. Cir.1981), *aff'g,* 20 Fair Empl.Prac.Cas. (BNA) 342 (D.D.C.1979); *United States v. Trucking Management, Inc.*, 25 Empl.Prac.Dec. (CCH) ¶ 31,571 (D.D.C.1980); *United States v. Trucking Management, Inc.*, 22 Empl.Prac.Dec. (CCH) ¶ 30,872 (D.D.C.1980) [Available on WESTLAW, DCT database]; *United States v. Trucking Em-*

backpay and transfer provisions from the consent decree. *United States v. Trucking Management, Inc.,* 20 Fair Empl.Prac. Cas. (BNA) 342, 351 (D.D.C.1977), *aff'd,* 662 F.2d 36 (D.C.Cir.1981).

The consent decree states that the employers who entered into it "deny the existence of any violations of Title VII and Executive Order 11246 and maintain that they have complied with and will continue to comply in all respects with said Title VII and Executive Order 11246." The decree provides further:

> This Decree, being issued with the consent of the Defendant Employers, shall not constitute an adjudication or finding on the merits of the case and shall in no manner be construed as an admission by the Defendant Employers of any violation of said Title VII or of Executive Order 11246, or of any other executive order, law, rule or regulation dealing, or in connection with, equal employment opportunity.

Section I of the consent decree, captioned "General Provisions," provides in its entirety:

> The Defendant Employers, their officers, agents, employees, and successors shall hire and assign Black and Spanish-surnamed applicants for employment, and shall promote, transfer, train, demote and dismiss such employees without regard to race, color or national origin and without engaging in any act or practice which discriminates against any Black or Spanish-surnamed person because of race, color, or national origin with respect to employment opportunities, and shall hire, promote and transfer employees in such a way as to provide employment opportunities to Black and Spanish-surnamed persons which are equal to those provided to white persons.

Section II of the decree sets interim hiring goals and long-range attainment levels for Black and Spanish-surnamed workers. It provides that "[a]ll hiring goals and at-tainment levels shall be subject to the availability of qualified Black and Spanish-surnamed persons." Two alternative procedures for meeting the goals are established. The first procedure specifies hiring goals of at least one-third Black and Spanish-surnamed workers in certain classifications for those terminals located in areas where the working age minority population is 25 percent or less, and at least half Black and Spanish-surnamed for those terminals located in areas where the working age minority population is more than 25 percent. The alternative procedure involves the establishment of an affirmative action hiring program.

Section IV of the decree requires employers to disseminate employment information in the Black and Spanish-surnamed communities and to recruit minorities affirmatively for managerial positions. Section V provides that if employers are unable to employ a sufficient number of qualified minority workers, they are to establish or participate in training programs.

Section VIII of the decree concerns record-keeping and reporting requirements. In relevant part, the record-keeping requirements provide:

> Each Defendant Employer shall maintain records concerning all applications, hires by job classification, transfers under the terms of this Decree, disqualifications, and dismissals during the life of this Decree. The Defendant Employer shall also record on the application of each Black and Spanish-surnamed applicant for employment who was found not to be qualified or otherwise was not hired, the reason therefor. The Defendant Employer shall maintain all records on which each report required below is based.

The reporting requirements of Section VIII require the employers to submit semi-annual reports detailing the racial composition of the existing work force, applicants, and

*ployers, Inc.,* 13 Fair Empl.Prac.Cas. (BNA) 373 (D.D.C.1975), *motion denied,* 13 Fair Empl.Prac. Cas. (BNA) 375 (D.D.C.1976), *motion denied,* 13 Fair Empl.Prac.Cas. (BNA) 376 (D.D.C.), *motion granted,* 72 F.R.D. 98 (D.D.C.), *petition denied,* 72 F.R.D. 101 (D.D.C.), *motion denied,* 75 F.R.D. 682 (D.D.C.1977).

hires and fires for the previous reporting period.

Section IX of the decree concerns notice requirements. In pertinent part, Section IX provides:

With respect to any alleged violations of this Decree which come to the attention of the Plaintiff [the government], Plaintiff shall give the Defendant Employer's Corporate Compliance Official written notice of the alleged violation, and the Defendant Employer shall have 60 days after receipt of the written notice to investigate and correct or refute the alleged violation before the Plaintiff may apply to the Court for an order on account of any such alleged violation. With respect to questions or disputes that may result in monetary liability against a Defendant Employer, the promptness of the Plaintiff or the Compliance Coordinator in bringing the question to the attention of the Defendant Employer shall be taken into account along with other relevant factors in determining what if any monetary liability exists under this Decree.

### 3. Reporting and Notice Pursuant to the Decree

The reports required by Section VIII of the consent decree are to be sent to the EEOC, the Department of Justice, and the Department of Labor's Office of Federal Contract Compliance Programs. Over the life of the decree, CWT submitted all required compliance reports in a timely fashion. In the twelve years since the decree was entered into, the government has been provided with 24 reports on CWT's hiring record, at the rate of two per year.

Between August 20, 1974 and June 27, 1979, the parties exchanged at least eight letters regarding the consent decree. These letters addressed generally technical questions such as appropriate census figures, the combining of smaller terminals for purposes of attainment goals, and clarification of language in the consent decree.

None of the letters concerned alleged violations of or other non-compliance with the consent decree.

On November 29, 1979, a letter was sent by the EEOC to R.D. Newberry, CWT's corporate compliance officer. The letter was signed by a paralegal on behalf of a supervisory trial attorney. In relevant part, that letter stated: [4]

We have reviewed the compliance report you submitted [ ] to the Partial Consent Decree, for the 6–month period [ ] October 1, 1979. Certain data in that report cause [ ] concern. The company has a total of 102 road drivers [ ] Chicago, Illinois, terminal of whom 8 are black. [ ] population of Chicago is 20.5%. Similarly, out of [ ] 271 city drivers only 9 are black. Also at this [ ] the company has a total of 45 clericals of whom none [ ] black.

We would also, [sic] like to call your attention to the [ ] Part IV B of the Decree provides for recruitment [ ] efforts aimed at increasing blacks and Hispanics in [ ] supervisory positions. We note despite the fact [ ] Chicago terminal has a total of 59 sales/supervisory [ ] only 1 minority is present (1.7%).

It is our view that this underpresentation [sic] is noteworthy [ ] light of the length of time during which C W has been [ ] by the Decree and the amount of hiring which has taken [ ] in Chicago. We would appreciate your reviewing the [ ].

On May 8, 1981, Newberry was sent a letter by an EEOC supervisory trial attorney. This letter states:

I have reviewed CW's compliance report of April 29, 1981, filed pursuant to the Partial Consent Decree in the above-captioned case. The report is rather disappointing in a number of respects.

Initially although there was a substantial amount of hiring at the Chicago terminal—20 road and 16 city employees—only three road hires and none of the city

---

**4.** The photocopy of this letter submitted as Exhibit I by the EEOC has the right margin cut off. Words or parts of words are missing from the end of every line. Where it is obvious what the remainder of a word would be, I have included the entire word. Where words clearly are missing, I have used brackets in the quotation from the letter.

hires were minority. Both these categories remain substantially below their long range attainment levels. Moreover, there were substantial number[s] of minority applicants, at least in the road driving category. These factors taken together cause me considerable concern.

Although no other CW terminal did any substantial hiring during the period, company-wide your report shows a total of 19 sales supervisory hires—all of them white. The company's sales and supervisory force numbers only 3 minority workers out of a staff of 273. While many of these employees are domiciled in areas of low minority population, cities such as Charlotte and Milwaukee also employ supervisory staff; and, again, Chicago with only one black in its sales and supervisory staff of 51 is a cause for concern. As I am sure you are aware, the Partial Consent Decree provides that, where an employer has failed to make satisfactory progress in improving minority representation among its sales and supervisory force within the first three years of the Decree, it is obliged to establish a management training program for minority applicants. Such a program would surely seem warranted here.

I would appreciate hearing from you with respect to these problems....

On August 13, 1983, John Milton of the EEOC sent a letter to Newberry which stated in its entirety:

This will follow-up on previous notices to C.W. Transport, Inc. of the failure to meet hiring goals and to reach a reasonable representation of minorities in management jobs at the Chicago terminal as well as other facilities. The violations noted in our letter of November 29, 1979 have apparently continued. We urge C.W. Transport, Inc. to address this matter promptly.

On July 22–23, 1985, Milton conducted an on-site review of CWT's Chicago terminal. Following that review, he wrote to Newberry on August 6, 1985. In relevant part, that letter stated:

The audit revealed that the company has made some progress in meeting hiring goals for union jobs except clerical positions. It also appears that the company has failed to obtain a reasonable representation of Black and Spanish-surnamed employees in salaried positions....

In addition, the EEOC's review of CW's companywide data showed that the company has failed to meet hiring goals and attainment levels in various union jobs at many of its terminals and to hire or promote a reasonable number of minorities into salaried positions.... As stated during our recent meeting, it is our view that these failures on the part of C.W. Transport have resulted in the loss of employment opportunities for members of the protected class....

To address these problems, we invite the company to submit a detailed proposal within 30 days....

After we have completed our review of the company's proposal and the data requested during the audit, we will contact your office to arrange a meeting to resolve any outstanding issues....

On October 23, 1985, Newberry wrote to Milton of the EEOC, submitting the requested proposal "in the spirit of conciliation." CWT noted, however, that "we are by no means acknowledging that we have violated the consent decree." On January 16, 1986, Milton responded with an "outline for the company's consideration in re-drafting its settlement proposal" as well as the EEOC's "additional requirement's [sic] and suggestions."

### 4. Employee Turnover and Record Loss at CWT

The Chicago facility, CWT's largest terminal, has employed more than 500 workers at various times. Since 1974, the Chicago terminal has experienced considerable turnover in supervisory personnel due to resignations, deaths, terminations, retirements, and work force fluctuations. Company-wide, at least 96 supervisors have left CWT since 1974 due to resignation, termination, retirement, or death. Each of these supervisors had hiring and firing authority for the positions under their supervision. Neither CWT's regional manager in charge of the Chicago terminal nor its vice presi-

dent of personnel knows where most of these persons presently are located. The burden and expense of locating these persons would be great.

Since 1974, CWT has acquired three companies: Overland Transportation in 1975, Trans Illinois Express in 1979, and Blue Arrow/Arledge in 1983. Under the collective bargaining agreements, CWT was required to employ workers from these companies. Senior employees from these companies could bump junior employees of CWT, resulting in layoffs of CWT employees. CWT is obliged to rehire laid off workers before hiring new employees. Because of the acquisitions of other companies, various terminals were acquired and closed. In addition, CWT has closed at least eighteen of its own terminals due to economic and other circumstances since the decree was signed.

The Chicago facility stored large volumes of old employment records in the basement. Sometime during the fall of 1979 or the spring of 1980, the Chicago terminal experienced severe flooding in its basement. In 1985, the basement flooded again as a result of construction on an adjoining street. In both floods, records were destroyed, although CWT cannot catalog precisely what records were lost. Since 1974, the Chicago terminal's personnel office has moved twice, once in 1979 and again in 1982. In each move, employment records were destroyed or stored, as well as lost or misplaced.

Records have been lost or destroyed by natural disasters at other facilities as well. In 1981, a tornado destroyed the storage area at the West Frankfurt, Illinois terminal. In 1984, a pipe froze and broke at the Richmond terminal, damaging records in a storage room. The damaged records were discarded, and exactly what was lost is not known. Also in 1984, CWT's office in Wisconsin Rapids moved from one location to another; several boxes of employment records were lost or misplaced in this move. In 1985, a terminal manager who left the Atlanta facility removed records when he left.

Bill Close, the regional manager in charge of the Chicago terminal, was unaware that the EEOC required employers who signed the consent decree to keep all applications. Close first learned of the EEOC's position during an on-site inspection at the Chicago facility in 1985. Prior to the on-site inspection in 1985, it was CWT's practice to purge job applications approximately every six months.

R.D. Newberry is vice-president of safety and personnel for CWT in Wisconsin Rapids, Wisconsin; he has held that position since 1971. Newberry is also CWT's corporate compliance officer under the consent decree. In that capacity, he is responsible for furnishing the government with the reports required by the decree. It has never been Newberry's understanding that CWT was required to retain all applications for employment during the life of the decree. It is unlikely that the company retains employment applications for rejected applicants that pre-date the last quarter of 1984.

## 5. The EEOC's Compliance Procedures

The EEOC has a General Counsel's Manual, section VII of which is entitled, "Monitoring Compliance with Consent Decrees or Other Orders." The manual assigns to staff attorneys the responsibility to direct analysis of reports, conduct on-site inspections, and determine when violations of consent decrees have occurred. In addition, staff attorneys prepare lists of tasks to be performed by research analysts with the goal of "seek[ing] to pinpoint violations of the decree." The manual provides further for on-site inspections by staff attorneys, following which the attorney is directed to prepare a letter for the employer "describing any policies believed not to be in compliance with the decree, and necessary remedial action." Finally, the manual sets forth procedures to be followed where non-compliance is discovered:

> Where the periodic reports and on-site inspections reveal that the defendant has filed to adhere to the material provisions, it should be warned about such failures and the alleged violations should be detailed in writing. If defendant refuses to

correct the violations, the staff attorney should make an appropriate recommendation to the Regional Attorney.

## OPINION

### I. LACHES

CWT's primary argument on its motion for summary judgment is that this enforcement petition is barred by laches. CWT contends that twelve and one half years elapsed between the signing of the consent decree and the filing of the enforcement petition, that this delay is unreasonable, and that the delay caused CWT to suffer all the classic elements of prejudice: unavailable witnesses, faded memories, and lost records. In opposition, the EEOC argues that the defense of laches is not applicable to a petition to enforce on-going violations under a consent decree. Alternatively, the EEOC contends that laches should not bar its entire claim, but only limit the time period for which relief can be obtained.

■ The consent decree entered into by CWT does not contain an express expiration date or any express limitation on the time in which the government may seek to enforce the decree.[5] Nonetheless, in the absence of an expiration date or statute of limitations, the EEOC may be barred by laches from filing a petition "if it has delayed inexcusably and the defendant was materially prejudiced by its delay." *Equal Employment Opportunity Commission v. Massey-Ferguson, Inc.*, 622 F.2d 271, 275 (7th Cir.1980). The affirmative defense of laches "is appropriate only if the Commission has 'unduly,' 'inexcusably,' 'unreasonably' or 'inordinately' delayed in asserting

a claim and that delay has 'substantially,' 'materially' or 'seriously' prejudiced the defendant's ability to conduct its defense." *Id.*

■ Because delay and prejudice generally are questions of fact, usually a determination of laches is not appropriate on a motion for summary judgment. *Id.; Jeffries v. Chicago Transit Authority*, 770 F.2d 676, 679 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). However, where the underlying facts are not in dispute, the existence of delay and prejudice become legal questions. *Jeffries*, 770 F.2d at 679; *EEOC v. Indiana Bell Telephone Co., Inc.*, 641 F.Supp. 115, 117 (S.D.Ind.1986). In this case, the EEOC has chosen not to contest any of the findings of fact proposed by CWT. Consequently, consideration of laches in the context of a motion for summary judgment is appropriate.

Laches first was recognized as a defense to lawsuits brought by the EEOC in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 372–73, 97 S.Ct. 2447, 2457–58, 53 L.Ed.2d 402 (1977). Since that time, federal courts have employed laches to bar discrimination actions filed both by the EEOC and by private plaintiffs. *See, e.g., Massey-Ferguson*, 622 F.2d 271 (action brought by EEOC); *Jeffries*, 770 F.2d 676 (action brought by individual after receiving right-to-sue letter from EEOC). In each case, however, the action originated with a charge of discrimination filed by an individual with the EEOC, and in each case the court used the time between the filing of the charge and the filing of the complaint in district court as one element of the delay prong of the laches defense.[6] In all these

---

**5.** CWT argues that the consent decree contains what it refers to as a codified laches provision. This argument rests on one sentence in the Section IX notice requirements:

With respect to questions or disputes that may result in monetary liability against a Defendant Employer, the promptness of the Plaintiff or the Compliance Coordinator in bringing the question to the attention of the Defendant Employer shall be taken into account with other relevant factors in determining what if any monetary liability exists under this Decree.

I am not persuaded that this provision represents any limitation on the time in which the EEOC may file an enforcement action. By its express terms the provision merely affects the amount of damages that the government may be able to recover if it prevails in its enforcement action.

**6.** *See Jeffries*, 770 F.2d at 679–80 (9 year, 3 month delay between filings unreasonable); *EEOC v. Dresser Industries, Inc.*, 668 F.2d 1199, 1202 (11th Cir.1982) (5 year, 8 month delay between filings "intolerable"); *Equal Employment Opportunity Commission v. Alioto Fish Co.*,

cases, the filing of the charge with the EEOC represented a specific date in time from which the element of delay could be computed.

In the present case, the EEOC is asserting on-going violations of the consent decree since its inception in 1974. There is no one time at which the alleged discrimination occurred and from which possible delay could be computed. As such, this enforcement action is far more analogous to a continuing violation or pattern and practice suit pursuant to Title VII than it is to the individual discrimination claims to which federal courts have found the doctrine of laches applicable.[7]

There is a dearth of authority on the application of laches to either continuing violation suits or enforcement actions under consent decrees. In *EEOC v. Dresser Industries, Inc.,* 668 F.2d 1199 (11th Cir. 1982) the Court of Appeals for the Eleventh Circuit applied laches to bar an action in which five years and eight months had elapsed between the filing of the charge with the EEOC and the filing of the complaint. In affirming the dismissal of the suit alleging discrimination in hiring on the basis of sex, the court noted: "Our affirmance of the dismissal of this action against Dresser Industries by no means prevents the EEOC from filing a current charge, investigating it, and filing a new lawsuit if, as alleged, discriminatory practices are continuing." 668 F.2d at 1200 n. 2. The court later repeated its admonition that dismissal of a particular lawsuit on the basis of laches does not affect the government's ability to prosecute continuing violations. "As we noted earlier, this opinion in no way places a straight jacket on the EEOC to prohibit it from pursuing a pattern of discrimination that is allegedly occuring at Dresser." *Id.* at 1204. The court of appeals did not indicate, however, whether it would find the doctrine of laches applicable to a pattern and practice action.

In *Equal Employment Opportunity Commission v. American National Bank,* 574 F.2d 1173 (4th Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), the court of appeals vacated the lower court's dismissal on the ground of laches. The lawsuit was initiated by a charge filed with the EEOC by an individual plaintiff; seven years later the EEOC filed a pattern and practice suit alleging discrimination on the basis of race. The district court dismissed the case on the ground of laches, finding that the seven year delay was unreasonable and that the loss of records pertaining to the individual (Holland) prejudiced the bank's ability to defend. In reversing and remanding, the appeals court stated:

> [T]he commission's suit was not concerned merely with the Holland charge; it alleged a pattern and practice of racial discrimination.... [T]he district court's finding of prejudice rested primarily on the lost evidence concerning Holland's initial charge. This loss may justify denial of relief to Holland, but it does not establish the bank's inability to defend the pattern and practice suit.

623 F.2d 86, 88 (9th Cir.1980) (5 year, 2 month delay between filings unreasonable); *Massey-Ferguson,* 622 F.2d at 277 (4 year, 9 month delay between filings unreasonable); *Bernard v. Gulf Oil Co.,* 596 F.2d 1249, 1257 (5th Cir.1979) (9 year delay between filings not inexcusable delay); *Equal Employment Opportunity Commission v. Liberty Loan Corp.,* 584 F.2d 853, 857–58 (8th Cir.1978) (4 year, 4 month delay between filings unreasonable); *Indiana Bell Telephone Co., Inc.,* 641 F.Supp. at 123 (9 year delay between filings, of which 5 year, 4 month delay between end of conciliation efforts and filing complaint unreasonable); *EEOC v. Firestone Tire and Rubber Co.,* 626 F.Supp. 90, 92–93 (M.D.Ga.1985) (4 year, 11 month delay between filings unreasonable); *Equal Employment Opportunity Commission v. Bray Lumber Co.,* 478

F.Supp. 993, 997 (M.D.Ga.1979) (4 year, 5 month delay between filings unreasonable); *Equal Employment Opportunity Commission v. North Central Airlines,* 475 F.Supp. 667, 671 (D.Minn.1979) (5 year, 10 month delay between filings "not so inordinate as to warrant dismissal").

7. Although laches was used to bar pattern and practice suits in some of the cases cited in footnote 6, those pattern and practice actions originated with an individual charge filed with the EEOC, and the courts looked to that filing date in computing the element of delay. *See, e.g., Alioto Fish,* 623 F.2d 86; *Massey-Ferguson,* 622 F.2d 271; *Liberty Loan,* 584 F.2d 853.

*Id.* at 1175–76. Again, however, the court did not indicate whether it believed the doctrine of laches to be applicable to pattern and practice suits, but concluded only that prejudice to the defendant with respect to the claim of one individual should not operate as a bar to a pattern and practice action.

By contrast, the Court of Appeals for the Ninth Circuit, in applying laches to bar a back pay claim, stated:

> The EEOC also seeks injunctive relief against an alleged pattern and practice of discrimination that continued up to the time the action was brought in 1976. Prejudice from unreasonable delay may also hamper the defense of a claim alleging a pattern and practice of discrimination and may justify dismissal of an entire action.

*Alioto Fish,* 623 F.2d at 89. Similarly, at least one district court has stated in dicta that the equitable defense of laches is available in a pattern and practice action. *Equal Employment Opportunity Commission v. Continental Oil Co.,* 393 F.Supp. 167, 170 (D.Colo.1975).

Most recently, in *EEOC v. Chicago Miniature Lamp Works,* 640 F.Supp. 1291 (N.D.Ill.1986), the employer claimed that the EEOC's continuing violation suit was barred by laches. The employer contended that it had filed a routine EEO statement in 1970 showing underrepresentation in its workforce, and that the EEOC should have pursued its claims at that time. In rejecting this argument, the court stated: "Laches, after all, is based on inaction following *actual* knowledge, not following the kind of fictitious imputed knowledge urged by Chicago Miniature." *Id.* at 1297 (emphasis in original). Although the court refused to apply laches to the facts of its case, it did not reject the concept of laches as a defense to a continuing violation suit.

Cases applying the doctrine of laches directly to consent decrees are rare. In *Jones v. Milwaukee County,* 574 F.Supp.

500, 502–03 (E.D.Wis.1983), the United States District Court for the Eastern District of Wisconsin found the doctrine applicable to individual actions seeking supplemental relief, though the court held that the elements of laches were not present in the particular case before it. The court did not discuss the basis for its finding that laches could apply to a consent decree action. More recently, the Court of Appeals for the Seventh Circuit considered actions brought under the 1972 *Shakman* decree, which controls the use of political patronage in the city's employment practices. *Smith v. City of Chicago,* 769 F.2d 408, 410 (7th Cir.1985). The court noted that litigation under the *Shakman* decree had become "routine business," and that the dismissal of those lawsuits on the basis of laches had become equally common. *Id.* at 410–11. To avoid the "costly, enervating sideshow" of determining laches in each individual instance, *id.* at 410, the court of appeals created a statute of limitations for enforcement actions. *Id.* at 411. Analogizing contempt proceedings pursuant to the *Shakman* decree to individual discrimination actions under Title VII, the court borrowed the 180 day statute of limitations from Title VII. *Id.* at 413. Under Title VII, an individual has 180 days to file a charge of discrimination with the EEOC or the appropriate state agency; following *Smith,* individuals bringing actions under the consent decree also have 180 days in which to file suit. The court of appeals noted, however, that the district courts might continue to apply laches to suits filed prior to the *Smith* decision. *Id.*

The *Smith* decision is less helpful in this instance that it first appears. The contempt proceedings brought in district court under the *Shakman* decree have been filed by individual litigants seeking to redress particular instances of mistreatment. The various *Shakman* decree cases have not addressed the situation of a general pattern and practice or continuing violation suit brought to enforce that decree.[8]

---

**8.** As an alternative ground for dismissal, CWT argues that the present enforcement action is barred by the statute of limitations established in *Smith.* As noted in the text of this opinion,

however, there are substantial differences between the actions brought to enforce the *Shakman* decree and the enforcement petition in this case. The overriding distinction is that the

It is clear that laches may be applied to discrimination suits filed by the EEOC or by individual plaintiffs where the genesis of the action was a charge filed by an individual. Also it is clear from *Smith* that prior to the setting of a statute of limitations, laches was applied appropriately in individual contempt actions brought to enforce a consent decree. The question now before this court is whether the doctrine of laches can bar a pattern and practice or continuing violation type action brought to enforce a consent decree.

In *Smith* the court noted that it was dealing with a judicial decree, and that

[A] violation of that decree is contempt of court. There is no fixed statutory period for prosecuting civil contempts, but federal courts may borrow suitable periods of limitations from other statutes as a matter of federal law.

*Id.* at 411. Although in this case the most analogous type of action—a pattern and practice suit under Title VII—has no statutory period of limitations that this court could borrow, *cf. Massey-Ferguson,* 622 F.2d at 275, the decision in *Smith* is a clear indication that the court of appeals approves of some time limits on actions to enforce consent decrees.

■■■ The doctrine of laches "is principally a question of the inequity of permitting a claim to be enforced." *Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 340 (7th Cir.1982). Its primary purpose is to prevent a defendant from having to litigate a lawsuit in which its defense has been prejudiced by time and a material change in circumstances. These principles apply as well to pattern and practice type enforcement proceedings as they do to other types of lawsuits. I conclude that the doctrine of laches is available to CWT as an affirmative defense to the enforcement petition filed by the EEOC. If

*Shakman* cases are individual actions analogous to actions initiated under Title VII by filing a charge with the EEOC. It was logical for the court of appeals in *Smith* to apply to those contempt actions the statute of limitations for the similar Title VII actions.

By contrast, the enforcement action now before this court is far more analogous to a pattern and practice suit under Title VII, for which

there have been both unreasonable delay and material prejudice, this lawsuit may be barred by laches.

### A. Unreasonable Delay

■■■ The first element of laches is delay. In order to bar an action on the ground of laches, however, "a court must find not merely a delay, but an inexcusable, unreasonable, undue or inordinate delay in asserting a claim." *Indiana Bell Telephone,* 641 F.Supp. at 117–18. While courts are reluctant to find that any specific time period is per se unreasonable, delays of between four years, five months and nine years, three months have been held unreasonable as a matter of law in cases initiated by the filing of a charge with the EEOC. *See* cases cited at footnote 6.

In the present matter, twelve and one half years passed between the signing of the consent decree and the filing of this enforcement petition. The timetable, established by the undisputed facts, is as follows:

| | |
|---|---|
| March 20, 1974 | consent decree entered into |
| Nov. 29, 1979 | EEOC requests CWT to review its "noteworthy" underrepresentation |
| Aug. 20, 1974– July 27, 1979 | eight letters exchanged between parties, none of which addressed any alleged violations or non-compliance |
| May 8, 1981 | EEOC expresses "concern" over underrepresentation at CWT and suggests time is ripe for CWT to establish a management training program. EEOC "would appreciate hearing from" CWT |
| August 13, 1983 | EEOC states that CWT should promptly address continuation of violations noted in letter of November 1979 |
| July 22–23, 1985 | on-site inspection of CWT's Chicago facility |
| August 6, 1985 | EEOC requires detailed compliance proposal from CWT |

that law establishes no statute of limitations. I will not apply to a pattern and practice type enforcement action a statute of limitations created by federal law for a different type of lawsuit. Summary judgment will be denied to CWT on this claim on the ground that the statute of limitations established in *Smith* does not control the type of action filed in this case.

| | |
|---|---|
| Oct. 23, 1985 | CWT submits proposal |
| Jan. 16, 1986 | EEOC responds to proposal |
| Sept. 15, 1986 | EEOC files enforcement petition in this court |

It is undisputed that during this entire period CWT timely filed its required reports every six months. Furthermore, the letters exchanged between the parties indicate that the EEOC reviewed these reports on a regular basis.

I find as a matter of law that the delay between March 20, 1974 and November 29, 1979 was clearly unreasonable.[9] For the first five and one half years of the consent decree, the EEOC took no action whatsoever with regard to CWT, despite the fact that it was receiving and reviewing biannual reports and despite the fact that it now claims that violations of the consent decree were continuing during that period.[10] The EEOC has offered no justification for this delay and none appears in the record. Accordingly, I conclude that this delay was unreasonable.

■ It is just as clear that the period of time between the on-site inspection of the Chicago terminal in July 1985 and the filing of the petition in September 1986 was excusable delay. Following the on-site visit, the EEOC promptly informed CWT of the results of the inspection and set forth specific action for CWT to take. Between August 1985 and at least January 1986, the

parties were engaged in working on a proposal by CWT to increase its percentage of minority workers.[11] Following the apparent breakdown of negotiations over the proposal, there was a delay of only six months before the enforcement petition was filed with this court.

The time spent in actively negotiating a solution to CWT's alleged non-compliance cannot be considered unreasonable delay. *See Indiana Bell Telephone,* 641 F.Supp. at 119–20 (time spent in national conciliation efforts was excusable delay); *Fowler v. Blue Bell, Inc.,* 596 F.2d 1276, 1279 (5th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 671, 62 L.Ed.2d 648 (1980) (bar of laches applies only to unreasonable delay after EEOC has completed conciliation efforts) (disagreed with in part by *Massey-Ferguson,* 622 F.2d at 279 n. 4: "We do not entirely agree with the *Fowler* court's narrow reading ... on the issue of delay."). Nor was a period of a maximum of six months between the end of negotiations and the filing of the enforcement action unreasonable. Accordingly, I find that no unreasonable delay occurred after July 22, 1985.[12]

■ The time period between November 29, 1979 and July 22, 1985 presents a close call. Between those dates, the EEOC sent

---

9. Although it is unusual to divide the time prior to the filing of the lawsuit into periods of reasonable delay and unreasonable delay, such a division is not without precedent. *Indiana Bell Telephone,* 641 F.Supp. at 117–24. *See also EEOC v. Westinghouse Electric Corp.,* 592 F.2d 484, 487 (8th Cir.1979).

10. The facts that the biannual reports were required by the consent decree and that the reports were reviewed by the EEOC distinguish this case from *EEOC v. Chicago Miniature Lamp Works,* 640 F.Supp. 1291 (N.D.Ill.1986). There the court refused to find unreasonable delay in the EEOC's not acting upon a routine EEO report filed by the employer in 1970.

 ...EEOC receives an enormous volume of such routine filings—so much so that it cannot conceivably be expected to police them for statistical disparities and to launch investigations when any such variations are disclosed. ... Laches, after all, is based on inaction following *actual* knowledge, not following the kind of fictitious imputed knowledge urged by Chicago Miniature.

*Id.* at 1297 (emphasis in original). In the present lawsuit, of course, the reports were not routine filings, but required compliance reports, and the EEOC not only was expected to police them but in fact did so. Accordingly, in this case the EEOC's inaction followed actual knowledge of alleged violations of the decree.

11. It is not known whether negotiations between the parties respecting CWT's proposal continued after January 1986. The record reflects that on January 16, 1986, the EEOC responded to CWT's draft proposal with suggestions and additional requirements. The record is silent as to any communications between the parties after that date.

12. If the date on which the EEOC first notified CWT of the proposed on-site review were known, I would be inclined to find no unreasonable delay from that date forward. However, the parties have provided the court only with the actual dates of the inspection and not with any date of notification.

three letters to CWT, approximately one every two years. The first letter requested that CWT review the situation. A year and a half later, the second letter expressed "concern," suggested the establishment of a management training program, and mentioned that the EEOC would appreciate hearing from CWT. Two years later, the EEOC requested CWT to address promptly continuing problems under the consent decree. Two more years elapsed before the on-site inspection of the Chicago terminal.

The EEOC characterizes its letters to CWT as notices of violations of the consent decree, and contends that the letters represent on-going enforcement actions. Because the letters establish an on-going enforcement effort, the EEOC argues, there was no inexcusable delay. Even if I were to accept the EEOC's characterization of its letters—a characterization that is contested by CWT—I am not persuaded that they excuse the five and one half year delay. In five and one half years the EEOC sent CWT three letters concerning problems with implementation of the consent decree. With the arguable exception of the statement in the 1981 letter that a management training program "would surely seem warranted here," the letters required no specific action on the part of CWT. Rather, the letters merely requested CWT to review or address the EEOC's concerns in a general way. The record does not reflect that the EEOC ever followed up on its requests to "hear from" CWT. On the basis of the present record in this case, I cannot find that the conduct of the EEOC from November 29, 1979 to July 22, 1985 constitutes on-going enforcement activities that would excuse that five and one half year delay. Accordingly, I conclude that the delay between those dates was unreasonable.

In summary, I find that the delay in filing this enforcement petition is reasonable in part and unreasonable in part. The delay between entry into the consent decree on March 20, 1974 and the on-site inspection of the Chicago terminal on July

22, 1985 constitutes unreasonable delay. The delay between July 22, 1985 and the filing of this enforcement action on September 15, 1986 I find to be reasonable delay.

### B. Material Prejudice

 Unreasonable delay alone is insufficient to establish laches. There must also be undue prejudice as a result of the delay. *Massey-Ferguson*, 622 F.2d at 275; *Indiana Bell Telephone*, 641 F.Supp. at 124. Generalized harm from the mere passage of time does not amount to a showing of prejudice. *Equal Employment Opportunity Commission v. Radiator Specialty Co.*, 610 F.2d 178, 183 (4th Cir.1979). Rather, the delay must have " 'substantially,' 'materially,' or 'seriously' prejudiced the defendant's ability to conduct its defense." *Massey-Ferguson*, 622 F.2d at 275.

In laches cases involving the EEOC, there are certain "classic" or traditional elements of prejudice. Generally, these comprise the unavailability of witnesses, faded memories, changes in personnel, and the loss of pertinent records. *Dresser Industries*, 668 F.2d at 1203; *Indiana Bell Telephone*, 641 F.Supp. at 124. In addition, some courts have recognized as an element of prejudice an unfair enlargement of the defendant's potential back pay liability. *Firestone Tire and Rubber*, 626 F.Supp. at 93; *John W. Danforth Co. v. Veterans Administration*, 461 F.Supp. 1062, 1069 (W.D.N.Y.1978). Each of these elements will be discussed in turn below.[13]

### 1. Unavailability of witnesses

 CWT argues that because of the EEOC's unreasonable delay, it is severely prejudiced by the unavailability of witnesses. CWT proposed as facts, and the EEOC did not contest, that the Chicago terminal has had considerable employee turnover in supervisory positions, that the company as a whole has lost at least 96 supervisors with hiring authority since 1974, and that

**13.** This discussion applies, of course, only to the period of time between March 20, 1974 and July 22, 1985.

the Chicago terminal manager and the corporate compliance officer do not know where most of these ex-employees presently are located.

This circuit does not require a defendant to establish the witnesses' actual unavailability. Rather, on the theory that a company should not be responsible for terminations, retirements, and deaths occuring in the normal course of business, *Indiana Bell Telephone,* 641 F.Supp. at 124, this circuit requires only that the defendant " 'face the hardship of locating the former employees and procuring their testimony' " in order to establish witness' unavailability. *Jeffries,* 770 F.2d at 681, quoting *Liberty Loan,* 584 F.2d at 858.

In this case, the facts before the court are insufficient to establish that CWT is materially prejudiced by the unavailability of witnesses. The facts establish only that key CWT personnel—the manager in charge of the Chicago terminal and the vice president of personnel/corporate compliance officer—do not know where the majority of the supervisory ex-employees are located. These statements imply that those officers do know where some of the former employees are located. If the company knows the location of certain witnesses, then it does not "face the hardship of locating" those persons. Without more specific information as to which employees are unavailable in the sense that their locations are not known, I cannot determine when material prejudice resulting from the unavailability of witnesses attaches to CWT.

It may be, for example, that CWT knows the locations of all of its supervisory personnel who have left the company since a certain date. In that case, proving material prejudice later than that date from the unavailability of witnesses would be difficult. On the other hand, it may be that CWT knows the present whereabouts of only a handful of its former supervisors who left the company at various times since 1974. In that case, it is likely that witness unavailability would result in far more prejudice to the company.

## 2. Faded memories

A second element of prejudice is faded memories on the part of those witnesses who are available. "Courts have consistently relied on faded memories of events long past to find the prejudicial element of laches." *Indiana Bell Telephone,* 641 F.Supp. at 125.

In this case, there is no evidence before the court about the memories of available witnesses. For example, CWT submitted affidavits from Bill Close, regional manager in charge of the Chicago terminal, and R.D. Newberry, vice president of personnel and corporate compliance officer under the consent decree. Newberry has held his position as vice president since 1971. Neither affidavit demonstrates any fading of memory. CWT has not submitted affidavits from any other available witnesses that their memories of events have faded.

I am aware that some courts take what amounts to judicial notice that the mere passage of time fades memories. *See Alioto Fish,* 623 F.2d at 89 ("... the delay undeniably has dimmed the memories of available witnesses...."). Without denying that it does, I am not prepared to assume that the mere passage of time has such an effect on memories as to constitute material prejudice. In a case like this one, in which so much of the evidence is documentary and relates to routine, repetitive decisions, it is unlikely that the witnesses would have independent memories of the critical events no matter how soon the action had been filed.

## 3. Changes in personnel

Changes in personnel over time has been recognized as a separate element of prejudice, for two reasons. First, it may be that while witnesses generally are available, key witnesses have been lost, or witnesses who would have been favorable to the company have become hostile witnesses because of an intervening discharge. *See Firestone Tire and Rubber,* 626 F.Supp. at 93. The second reason goes to the issue of damages. As one court noted: "The passage of time has made it very difficult to prove the continuation of any loss of

wages, the extent to which [plaintiffs] mitigated damages, and the effects of continuing loss of seniority or possible promotions." *Indiana Bell Telephone*, 641 F.Supp. at 126.

In this case, there is much evidence of changes in CWT's personnel over the years since the consent decree was signed. However, there is essentially no evidence concerning how those changes may have prejudiced CWT's ability to defend this enforcement action. There is no showing that particularly important witnesses have been lost, or that essential witnesses have become hostile. The second reason articulated by the courts—difficulty of proving damages—I do not find particularly compelling even if it were established or assumed. It would appear that difficulties with establishing damages should be addressed at the damages phase of the lawsuit, and should not alone operate to bar the lawsuit altogether.

*4. Loss of records*

CWT argues that it is materially prejudiced by the loss of records it would need to defend this enforcement action. CWT's loss of records has resulted from two distinct series of events. The first of these is CWT's systematic destruction of employment applications in accordance with its internal business records retention/destruction schedule. The second consists of a number of natural disasters and the normal loss of records in the course of business.

CWT contends that it is severely prejudiced in its defense because it did not retain employment applications for more than six months. Prior to the onsite inspection of the Chicago terminal in July of 1985, the company routinely destroyed job applications after six months, and both the Chicago terminal manager and the vice president of personnel attest that they did not know that job applications had to be retained indefinitely. Accordingly, CWT argues, it does not have the precise, detailed applicant data necessary to defend itself. The EEOC counters that the plain language of the consent decree requires the company to

keep all job applications for the life of the decree. Consequently, the EEOC claims, any prejudice arising from the destruction of the job applications is the result of CWT's non-compliance with the decree and not the result of any delay in bringing an enforcement action.

■ Generally, consent decrees are viewed as contracts. *Firefighters Local 93 v. City of Cleveland*, ⎯ U.S. ⎯, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); *Kasper v. Hayes*, 814 F.2d 332, 338 (7th Cir.1987). In particular, a consent decree "is to be construed for enforcement purposes essentially like a contract; its meaning is to be sought within its 'four corners,' although aids to construction such as circumstances surrounding the formation of the order may appropriately be used to resolve ambiguities. A consent decree may be specifically enforced as written." *Jones v. Milwaukee County*, 574 F.Supp. at 503, relying upon *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 233–38, 95 S.Ct. 926, 932–35, 43 L.Ed.2d 148 (1975). *See also Kasper*, at 338 ("The source of the obligations in the decree is the parties' will...."). The resolution of the parties' dispute that CWT was required to keep all job applications is governed by the consent decree.

■ The relevant portion of Section VIII of that decree provides that:

Each Defendant Employer shall maintain records concerning all applications, hires by job classification, transfers under the terms of this Decree, disqualifications, and dismissals during the life of this Decree. The Defendant Employer shall also record on the application of each Black and Spanish-surnamed applicant for employment who was found not to be qualified or otherwise was not hired, the reason therefor. The Defendant Employer shall maintain all records on which each report required below is based.

CWT contends that this language in the decree requires it to keep only "records concerning all applications," and not the actual applications themselves. I do not find this argument persuasive.

First, the consent decree requires CWT to record "on the application" of each minority applicant who was not hired the reasons for the failure to hire. If CWT were required to record pertinent information on the face of the applications, but then was permitted to discard the applications after six months, this requirement of the decree would be meaningless. If I accept CWT's construction of the decree, the decree requires the company to engage in superfluous activity with regard to each rejected job application, using time and personnel to record on the application the reasons for rejection, only to discard the information shortly thereafter. It is nonsensical to suppose that the consent decree was intended to require such meaningless activity on the part of CWT.

Second, the consent decree expressly requires CWT to "maintain all records on which each report required below is based." The reports required by the consent decree include information on the number of hires during and the number of minority applications pending at the end of each reporting period. It is difficult to understand CWT's argument that a report on the numbers of minority applications is not "based" on the applications received from members of minority groups, but only on the subsequent compilation of data from those applications.

CWT argues also that it simply is not practicable for it to have retained all job applications over the life of the consent decree. Whatever the merits of this contention might be, CWT bound itself to do exactly that when it entered into the decree as written. If CWT were unable to comply with the terms of the decree, it could have sought a modification from the EEOC. As the consent decree now stands, however, it requires CWT to have retained all job applications since the decree was signed.

Accordingly, I cannot find that any prejudice attaches to CWT as a result of the loss of job applications through its normal practice of retaining and destroying records. Although a company's adherence to its routine schedule "does not impute any bad faith or consciousness of guilt," *Jeffries,*

770 F.2d at 681, here there were the supervening requirements of the consent decree. "A party cannot assert the defense of laches merely because it has failed to preserve evidence despite knowledge"—actual or imputed—that it was required to do so. *Bernard,* 596 F.2d at 1257. I conclude that the consent decree as written requires CWT to retain all job applications for the life of the decree, and that no material prejudice to CWT results from its own failure to observe that requirement.

In addition to the destruction of the job application records, CWT contends also that it has been prejudiced by the loss of records from other causes. One of these causes was natural disasters and similar circumstances. In 1979 or 1980, severe flooding at the Chicago terminal destroyed records stored in the basement. In 1985, another flood at Chicago caused by outside construction again destroyed records stored in the basement. A 1981 tornado destroyed the storage area of the Frankfurt, Illinois terminal. And in 1984 at the Richmond terminal, records were damaged when a pipe in a storage room froze and broke.

Other causes of record loss were mislaying of records and employee pilfering. The Chicago terminal personnel office moved in 1979 and again in 1982; in each move, employment records were lost or misplaced. In 1984, the main office in Wisconsin Rapids moved, and several boxes of employment records were lost or misplaced. A terminal manager who left the Atlanta facility in 1985 removed records when he left. In all these instances, CWT maintains that it cannot catalog what records were destroyed, lost, or misplaced.

Natural disasters and the loss of records in the ordinary course of business present situations different from the destruction of records that CWT was on notice that it should retain. However, on the record now before the court, I cannot say that CWT has suffered material prejudice from the natural disasters and other occurrences. CWT argues that because it cannot catalog precisely what records have been lost or destroyed, it has been substantially preju-

diced in general because of record loss. Accepting this argument would require a presumption that the loss of any records creates prejudice with regard to the entire case. I am not persuaded that such a presumption is reasonable.

■■■ Laches is an affirmative defense, on which the defendant bears the burden of proof. It is CWT's burden to establish that the loss of records from natural disasters and the normal course of business loss will prejudice its defense of this lawsuit. The burden cannot be met merely by showing that some unspecified records have been destroyed or misplaced during some occurrences at some facilities. Despite its claim that it cannot catalog precisely what records are missing, the company should know generally what records it maintained and, to some level of specificity, what records remain after the various natural disasters and other events. It does not seem unreasonable to require CWT to establish with more specificity what records are missing and why the loss of these records will materially prejudice its defense of this enforcement action.

### 5. Enlargement of defendant's liability

■■■ A final element of prejudice recognized by some courts is an unfair enlargement of the defendant's potential back pay liability. *Alioto Fish*, 623 F.2d at 89; *Firestone Tire and Rubber*, 626 F.Supp. at 93. "[T]he delay in this case has substantially and unfairly enlarged the company's potential back pay liability and this increased monetary liability which is attributable solely to the EEOC delay constitutes an additional element of prejudice supporting dismissal of the suit." *Firestone Tire and Rubber*, 626 F.Supp. at 93. In this case, the EEOC is seeking back pay liability of over eight and one half million dollars.

As I indicated earlier, however, I do not find the damages issue particularly compelling as an element of prejudice. If at trial the EEOC establishes that CWT has violated the consent decree, the question of the amount of CWT's back pay liability can be addressed at that time. In this context I note also that section IX of the consent decree requires the court specifically to consider, in determining "what if any monetary liability exists under this Decree," the promptness of the EEOC in bringing the enforcement action. Although I will take into account the timeliness of the action if the EEOC establishes liability, I will not consider the possible enlargement of CWT's potential back pay liability as an element of prejudice on the issue of the applicability of the laches defense.

### C. Conclusion

The affirmative defense of laches consists of unreasonable delay and material prejudice. Both elements must be present before the court will find that laches is present. In this case, I have concluded that the delay between the EEOC's on-site inspection on July 22–23, 1985 and the filing of the enforcement petition on September 15, 1986 was excusable delay. Laches does not bar the enforcement action for that period of time.

■■■ I have found also that the period of time between entry into the consent decree on March 20, 1974 and the on-site inspection in July 1985 was unreasonable delay. On the present record, however, CWT has failed to establish material prejudice to its defense for part or all of this time period. Nonetheless, it does appear that CWT may be able to prove material prejudice for some or all of this time period, and for that reason I am reluctant simply to deny CWT's motion for summary judgment. Rather, I will stay my decision on the laches issue covering the time period of March 20, 1974 to July 22, 1985 pending an evidentiary hearing on the question of material prejudice to CWT's defense of the enforcement action.

Finally, I would reiterate that in the foregoing section I concluded also that the 180 day statute of limitations established in *Smith v. City of Chicago*, 769 F.2d 408 (7th Cir.1985), for individual enforcement actions pursuant to the *Shakman* consent decree is inapplicable to the present action.

## II. NOTICE OF VIOLATIONS

▉ CWT's asserts as a second ground for summary judgment the EEOC's failure to give it the 60 day notice of violations required by the consent decree. The company argues that it was entitled to notice of the specific violations alleged—including date, place, circumstances, identified victims, and relief sought—for the entire twelve and one half year period, so that it could investigate and if necessary correct the alleged violations. The information provided by the EEOC's correspondence, CWT contends, was too vague and conclusory to put the company on notice. The EEOC counters that the consent decree establishes no legal standards or degree of specificity that the notice must meet, and argues further that the notice provided to CWT by the EEOC's correspondence was sufficient under the terms of the decree.

The applicable notice provision is found in section IX of the decree. In relevant part, that section provides:

> With respect to any alleged violations of this Decree which come to the attention of the Plaintiff, Plaintiff shall give the Defendant Employer's Corporate Compliance Official written notice of the alleged violation, and the Defendant Employer shall have 60 days after receipt of the written notice to investigate and correct or refute the alleged violation before the Plaintiff may apply to the Court for an order on account of any such alleged violation.

As noted earlier in this opinion, consent decrees are to be construed and enforced like contracts, and the meaning of the con-

sent decree is to be sought within its four corners. *Kasper v. Hayes,* at 338; *Jones v. Milwaukee County,* 574 F.Supp. at 503.

The notice provisions of this consent decree are unambiguous. The EEOC cannot file an enforcement petition in district court unless it has first provided CWT with written notice of the alleged violation and CWT has had 60 days in which to investigate and correct or refute the alleged violation. The enforcement petition in this action was filed on September 15, 1986. On August 6, 1985, following the on-site inspection of the Chicago terminal, the EEOC wrote CWT that: "the EEOC's review of CW's companywide data showed that the company has failed to meet hiring goals and attainment levels in various union jobs at many of its terminals and to hire or promote a reasonable number of minorities into salaried positions." The EEOC requested CWT specifically to submit a detailed proposal addressing the alleged underrepresentation of minorities in the workforce. On October 23, 1985, CWT submitted a proposal "in the spirit of conciliation," while maintaining that it had not violated the consent decree. On January 16, 1986, the EEOC responded with suggestions and additional requirements. Following that, the record is silent until the EEOC filed the enforcement petition with this court.

On the basis of these undisputed facts, I conclude that the EEOC's letter of August 6, 1985, constitutes "written notice of the alleged violation[s]" within the meaning of section IX of the consent decree.[14] The letter specifically informed CWT of the EEOC's contention that the company had

---

14. CWT contends further that the notice provided by the EEOC was not in compliance with the requirements of the EEOC's General Counsel's Manual. With respect to monitoring compliance with consent decrees, that manual provides that employers found to be in violation "should be warned about such failures and the alleged violations should be detailed in writing." (Section VII.D.7) The manual provides further that following an on-site inspection, the inspecting attorney should prepare a letter to the employer "describing any policies believed not to be in compliance with the decree, and necessary remedial action." (Section VII.D.6)

As noted in the text and as CWT itself maintains, a consent decree is to be construed and

enforced like a contract. Courts are not to look outside the four corners of the decree where its provisions are unambiguous. In this case, the notice provisions of the consent decree are unambiguous, and therefore I may not look beyond those contractual provisions to potential outside sources of additional requirements. Moreover, even if I were permitted to look to the General Counsel's Manual, I am not persuaded on the basis of the sections quoted by CWT that the EEOC's notice to it was not in compliance with the requirements of the manual. It appears, rather, that the EEOC did precisely what the manual suggests.

failed to meet the attainment goals of the consent decree, and invited CWT's response in the form of a proposal to correct the alleged underrepresentation. In light of the fact that the plain language of the consent decree does not require any particular level of specificity in the notice of alleged violations, I find that this letter was sufficient to put CWT on notice. Furthermore, it is obvious that between the date of this letter and the date of filing of the enforcement petition, more than the required 60 days had elapsed in which CWT could investigate and correct or refute. Construing the consent decree within its four corners, I find that the EEOC provided adequate notice to CWT of the alleged violations prior to the filing of the enforcement petition. Summary judgment on this ground will be denied.

### III. APPROVAL OF THE COMMISSION

CWT contends next that the EEOC failed to comply with its internal agency procedures in that it failed to obtain the necessary approval of the commission itself prior to filing this enforcement action. In making this argument, CWT relies upon provisions of Title VII, 42 U.S.C. § 2000e, which it argues establish that an action to enforce a consent decree cannot be initiated without express prior approval of the commission. In opposition, the EEOC claims that whereas prior commission approval is required for all new litigation, no such approval is necessary for an enforcement petition.

CWT points first to 42 U.S.C. § 2000e–5(i), which provides that "[i]n any case in which an employer ...fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceedings to compel compliance with such order." Although this section may establish that commission approval is required prior to bringing an action to enforce an order of a court, no order of a court is present in this case. *See Local Number 93 v. City of Cleveland,* —— U.S. ——, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986). Here the parties voluntarily entered into a consent decree, and it is that decree which the EEOC seeks to enforce.

I conclude from this that § 2000e–5(i) is not applicable to this case.

CWT next cites § 2000e–4(b)(2), which provides that "[a]ttorneys appointed under this section may, at the direction of the Commission, appear for and represent the Commission in any case in court...." CWT contends that this section establishes that EEOC attorneys may not appear except at the express direction of the commission. The EEOC argues in opposition that enforcement petitions are considered by the agency to be "on-going litigation" that do not require commission approval for specific enforcement actions. The EEOC's position here appears to be that when the EEOC was substituted as a party to the consent decree in 1974, that event operated as the commission's approval for its attorneys to appear and represent the commission with regard to the consent decree.

I am not persuaded by CWT's argument that it is entitled to summary judgment on the ground that the EEOC failed to comply with statutory procedures. First, neither party has adduced sufficient facts in the form of affidavits or other documents supporting their position. CWT relies upon EEOC affidavits filed in connection with other lawsuits and reported in decisions now twelve or thirteen years old for the proposition that the commission has never delegated its authority to approve the filing of lawsuits. *See EEOC v. Raymond Metal Products Co.,* 530 F.2d 590, 595 n. 12 (4th Cir.1976); *EEOC v. Laclede Gas Co.,* 530 F.2d 281, 286 (8th Cir.1976). The company does not submit a current affidavit to that effect. The EEOC relies upon nothing other than a bald assertion of fact for its proposition that "the Commission's consistent policy has been to leave enforcement actions of consent decrees with the Office of General Counsel" (EEOC's Memorandum in Opposition at 38). If in fact the agency has such a policy, it would be entitled to deference from this court, but the agency has not established the existence of that policy on the present record.

Second, the cases relied upon by CWT for the proposition that only the commission can approve the filing of lawsuits were

both instances of civil actions brought pursuant to Title VII. Neither case involved an action brought to enforce an on-going consent decree. The argument advanced by CWT rests upon cases involving civil suits initiated under Title VII and the Title VII statute itself. It is not persuasive of the contention that the same concerns are applicable necessarily to EEOC actions brought to enforce an on-going consent decree to which the EEOC is a party.

CWT has failed to establish that it is entitled to judgment as a matter of law on this issue. Accordingly, summary judgment will be denied to CWT on the ground that the EEOC did not obtain the approval of the commission prior to bringing this enforcement action.

## IV. PROPRIETY OF REQUESTED RELIEF

CWT raises a number of issues regarding the propriety, in whole or in part, of the relief requested by the EEOC. These arguments will be addressed in turn.

### A. Effect of EEOC's Notice on Availability of Damages

 CWT's first argument is that the EEOC's lack of notice to it that violations of the decree were occurring should operate to bar an award of damages. In support of this argument, CWT relies upon section 713(b) of Title VII, 42 U.S.C. § 2000e–12(b), which provides in part that "reliance on any written interpretation or opinion of the Commission" operates as a defense to any action or proceeding based on alleged unlawful employment practices, and upon *Yott v. North American Rockwell Corp.*, 428 F.Supp. 763, 768 (C.D.Cal. 1977), *aff'd*, 602 F.2d 904 (9th Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1316, 63 L.Ed.2d 761 (1980), which held that reliance upon an EEOC opinion letter may bar an award of damages even if it would not bar injunctive relief. CWT admits that the EEOC's correspondence, or lack of correspondence, in this case does not constitute a formal opinion letter, but contends by analogy that it relied upon the EEOC's silence as an indication that it was proceed-

ing properly under the consent decree. Accordingly, CWT contends, because it relied on the EEOC's lack of notice of violations, it cannot now be subject to back pay liability.

This argument is not persuasive. As CWT recognizes, no opinion letter within the meaning of section 713(b) is involved in this case. Nor is the purpose behind that section implicated here. Section 713(b) was intended to prevent a defendant from being liable for engaging in conduct that the EEOC had stated in writing was acceptable or proper. In this case, the EEOC has never provided CWT with an affirmative "interpretation or opinion" concerning the provisions of the consent decree. I cannot conclude that every time the EEOC did not notify CWT that something was wrong, such non-notification constituted an affirmative statement, upon which the company could rely in a damages action, that CWT was in full compliance with the consent decree. Summary judgment will be denied on this ground.

### B. EEOC's Contractual Obligations

 Next, CWT argues that the EEOC failed to fulfill certain express and implied contractual obligations pursuant to the consent decree. Specifically, CWT contends that the EEOC has an implied duty of good faith that includes a duty to act with diligence and the more particular obligation to report violations of the decree in a timely manner. CWT contends further that the decree imposes upon the EEOC an express duty of due diligence in reviewing the company's performance and reporting to it alleged violations. CWT now claims that the EEOC, in bringing a damages claim of over eight and one half million dollars some twelve years after the decree was entered into, has breached its contractual obligations and violated the company's due process rights.

As noted previously in this opinion, a consent decree has many of the attributes of a contract, and the meaning of a decree's provisions is to be sought within the four corners of the document. CWT contends that the decree "imposes specific dis-

closure and notice obligations upon the EEOC," (Memorandum in Support of Respondent's Motion at 80), but does not cite to any source in the decree for those specific obligations. Section IX of the decree requires the EEOC to give written notice of alleged violations and a 60 day investigation period prior to filing an enforcement action; I have determined in a previous section of this opinion that the EEOC complied with that provision of the consent decree. I have not located and the company has not pointed to any additional disclosure or notice obligation within the four corners of the decree.

CWT notes once again the provision of section IX that, in computing any monetary liability that CWT may have under the decree, the court is to take into account the EEOC's promptness in notifying CWT of the alleged violations. As explained previously in this opinion, however, that provision does not impose any affirmative obligations upon the EEOC and may not be used as a basis for dismissing the entire claim for monetary relief. Rather, the provision becomes important at the damages phase of the trial, where by its express terms it may operate to reduce or even eliminate the monetary liability of the company.

Construing the unambiguous provisions of the consent decree within its four corners, I cannot find that the EEOC breached any contractual obligations that the decree imposed upon it. Accordingly, summary judgment will be denied on this ground.

## C. Title VII Claims

█ CWT contends that, in the guise of bringing an action to enforce the consent decree, the EEOC is actually filing a new lawsuit pursuant to Title VII to litigate otherwise time-barred back pay claims. CWT argues that because the EEOC has not complied with Title VII's jurisdictional and procedural prerequisites to suit, this enforcement action must be dismissed.

If I understand CWT's argument correctly, the company is contending that any request for back pay necessarily implicates a new Title VII action and therefore cannot be brought as part of an enforcement action. This argument fails under the express terms of the consent decree. Section IX of the consent decree provides specifically that: "With respect to questions or disputes that may result in monetary liability against a Defendant Employer, the promptness of the Plaintiff ... shall be taken into account along with other relevant factors in determining what if any monetary liability exists under this Decree." By its express terms the decree contemplates that monetary liability may be available against CWT for violations of the decree. It is difficult to imagine what money damages other than back pay could be the basis for CWT's liability if it were found to have violated the consent decree.

Because the consent decree contemplates expressly the possibility of money damages, I am not persuaded by CWT's contention that a request for back pay relief necessarily gives rise to a new lawsuit under Title VII. Accordingly, summary judgment will be denied on this ground.

## D. Propriety of Damages and Contempt

█ CWT's major argument concerning the propriety of the relief requested by the EEOC is that neither money damages nor contempt is the appropriate sanction. Rather, CWT argues, if it is found to have violated the consent decree, the only appropriate remedy is a further order enforcing the decree.

In arriving at this novel contention, CWT relies upon a theory of injunctions developed by Professor Fiss of the Yale University Law School. Apparently Fiss has divided injunctions into three categories: preventive, reparative, and structural. *See* O.M. Fiss, *Injunctions* (1972); O.M. Fiss, *The Civil Rights Injunction* (1978). CWT argues that a consent decree is just like an injunction, and proposes that this consent decree contains preventive and structural aspects. According to CWT, the preventive aspect is found in section I of the decree, which outlines the decree's general provisions. CWT argues that section I is no more than a general "obey the law" injunction that is unenforceable by money

damages or contempt. The remaining sections of the decree, CWT contends, are structural in nature; that is, they seek " 'to effectuate the reorganization of an ongoing social institution' " (Memorandum in Support of Respondent's Motion at 49, quoting O.M. Fiss, *The Civil Rights Injunction* 7 (1978)). Because these sections seek only to restructure the company's compliance efforts, the appropriate remedy is neither contempt nor damages, but rather "for the Court to first try and induce collaboration" (Memorandum in Support of Respondent's Motion at 60).

CWT's theory fails for three reasons. First, this action does not involve an injunction, but a consent decree. CWT may argue that a consent decree "can be classified in the same manner as an injunction as it plays the same role and has the same equitable effect," (Memorandum in Support of Respondent's Motion at 49–50), but it has not cited any authority in support of its proposition. The courts have considered consent decrees to be a "hybrid," having attributes of both contracts and judicial decrees. *Local Number 93 v. City of Cleveland*, 106 S.Ct. at 3074. They have never suggested that consent decrees should be treated like voluntary injunctions. A theory developed in the context of injunctions does not transfer to the law concerning consent decrees.

Second, CWT argues that as a matter of law this consent decree cannot be enforced by contempt. On the contrary, as a matter of law contempt is the proper remedy. *See, e.g., Local Number 93*, 106 S.Ct. at 3074 ("... noncompliance with a consent decree is enforceable by citation for contempt of court"); *Kasper v. Hayes*, at 338 (consent decree "is an exercise of federal power, enforceable by contempt.").

Finally, CWT contends that money damages is not an appropriate remedy. However, CWT does agree that the court should look to the four corners of the consent decree in determining its provisions. As noted above, the consent decree contemplates expressly and without ambiguity the possibility of money damages for violation of the decree. As the United States Supreme Court has noted recently: "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Local Number 93*, 106 S.Ct. at 3076. *See also Kasper*, at 338 ("The source of the obligations in the decree is the parties' will, not federal law."). In this case, the will of the parties embodied in the provisions of the consent decree is that money damages may be an appropriate remedy for violations of the decree. Accordingly, summary judgment will be denied on the ground raised by CWT that the various claims for relief asserted by the EEOC represent inappropriate remedies.

## V. RACE–CONSCIOUS RELIEF

CWT's final ground for summary judgment is that the consent decree establishes a non-victim-specific, race-conscious remedy that is in violation of Title VII. I find the recent United States Supreme Court decision in *Local Number 93* to be dispositive on this question.

In *Local Number 93*, the Court upheld a consent decree containing race-conscious relief that might benefit persons who were not actual victims of discrimination. The decree was challenged in part on the theory that it was unlawful under section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), which provides in relevant part:

No order of the court shall require ... the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual ... was refused employment or advancement ... for any reason other than discrimination....

The petitioner in *Local Number 93* argued that if a court could not order non-victim-specific, race-conscious relief under section 706(g), employers could not agree voluntarily to such relief in a consent decree.

The Supreme Court disagreed, holding that "whether or not § 706(g) precludes a court from imposing certain forms of race-conscious relief after trial, that provision does not apply to relief awarded in a consent decree." 106 S.Ct. at 3072 (footnote

omitted). The Court noted that voluntary compliance is the preferred means of achieving the objectives of Title VII, and that "the voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination." *Id.* Because consent decrees are voluntary in nature, the Court found that they "are not included among the 'orders' referred to in § 706(g)." *Id.* at 3075. For this reason, the Court held, "whatever the limitations Congress placed in § 706(g) on the power of federal courts to impose obligations on employers or unions to remedy violations of Title VII, these simply do not apply when the obligations are created by a consent decree." *Id.* at 3076.

CWT attempts to distinguish the consent decree in the present action from the consent decree considered by the Supreme Court in *Local Number 93*, arguing that the consent decree in that case was entered only after a specific judicial finding of a "pattern of racial discrimination," *id.* at 3070, whereas in this case, no finding of discrimination has ever been made. Indeed, the introductory section to the consent decree notes specifically that it "shall not constitute an adjudication or finding on the merits of the case and shall in no manner be construed as an admission by the Defendant Employers of any violation of said Title VII...." CWT contends that without such a finding of past discrimination, it is unlawful for a consent decree to provide the type of race-conscious, non-victim-specific relief approved in *Local Number 93*.

I find CWT's distinction to be one without a difference. Clearly the preferred means of achieving the objectives of Title VII is voluntary compliance. 106 S.Ct. at 3072. One method of voluntary compliance is the consent decree, which has as "its most fundamental characteristic" its voluntary nature. *Id.* at 3075. Under the holding in *Local Number 93*, employers can agree voluntarily, through a consent decree, to institute race-conscious, non-victim-specific measures to achieve the objectives of Title VII. The argument advanced here

by CWT would make this voluntary compliance dependent upon a prior judicial finding of past discrimination. In essence, CWT's proposed distinction would require a court action to determine past discrimination before a party could enter into an enforceable consent decree, one purpose of which is to avoid litigation. I have little doubt that this proposal "would make it substantially more difficult to settle Title VII litigation, contrary to the expressed congressional preference for voluntary remedial action." *Id.* at 3077 n. 13.

Moreover, the Supreme Court has reaffirmed recently, in the context of a voluntary affirmative action plan, its holding that voluntary action does not require a prior finding of past discrimination. *Johnson v. Transportation Agency,* — U.S. —, —, 107 S.Ct. 1442, 1450, 94 L.Ed.2d 615 (1987). To justify such voluntary action, an employer "need not point to its own prior discriminatory practices, nor even to evidence of an 'arguable violation' on its part," but rather only to a manifest imbalance in the composition of its workforce. *Id.*, citing *Steelworkers v. Weber,* 443 U.S. 193, 209, 212, 99 S.Ct. 2721, 2730, 2731, 61 L.Ed.2d 480 (1979). As the Court noted, Title VII "should not be read to thwart" voluntary efforts to further the act's purposes. *Id.* The Court's decision in *Johnson* supports the conclusion that adopting CWT's rationale would thwart voluntary action to eradicate the effects of discrimination in the workplace.

Based on these decisions of the Supreme Court, I find that the measures provided in the consent decree to achieve the objectives of Title VII are not unlawful under that act. Summary judgment on this ground will be denied.

### ORDER

IT IS ORDERED that respondent's motion for summary judgment is DENIED on the issue of laches for the period of time between July 22, 1985 and September 15, 1986. A decision on the issue of laches for the period of time between March 20, 1974 and July 22, 1985 is STAYED pending an

evidentiary hearing on the question whether CWT was materially prejudiced by the EEOC's unreasonable delay during that time. In all other respects and on all other grounds, defendant's motion for summary judgment is DENIED.

The evidentiary hearing on the question of material prejudice between March 20, 1974 and July 22, 1985 is scheduled tentatively for the week of July 20, 1987. The parties will be provided with an exact date and time in the near future.